# Richmond

## H. I. HORNE, ET AL. v. R. W. HOLLEY.

November 12, 1936.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*John Roberts, M. M. Long* and *E. M. Fulton,* for the appellants.

*O. M. Vicars, Lewis R. McCormick* and *Morton & Parker,* for the appellee.

*EGGLESTON, J., delivered the opinion of the court.

R. W. Holley filed a bill of complaint in the court below against H. I. Horne, The Home Land & Investment Company, Inc., and others, to establish and enforce a constructive trust in certain property which it is alleged Horne and Holley had agreed to purchase jointly, but which Horne, in fact, purchased in the name of The Home Land & Investment Company, Inc. From a decree sustaining the contention of the complainant this appeal has been allowed.

The principal assignment of error is that the finding of the lower court is contrary to the law and the evidence.

From the rather voluminous record the following pertinent facts appear: On February 10, 1930, the Peoples Bank of Appalachia, Inc., a banking institution incorporated under

---

*Due to circumstances beyond our control it was necessary to re-assign the writing of this opinion. Hence the delay.

the laws of Virginia and doing business at Appalachia in said State, was, by a decree of the Circuit Court of Wise county, placed in the hands of J. Charles Jones, receiver.

Efforts to reorganize and reopen the bank having failed, the receiver undertook to obtain a satisfactory bid for all of the assets, consisting of uncollected notes, bonds, other choses in action, office furniture and real estate.

One of the parties first interested in purchasing these assets was R. W. Holley, a resident and former treasurer of Wise county. On December 15, 1930, the Appalachia Finance Company, Inc., a close corporation which had been organized by Holley for the purpose, submitted a bid to the receiver for the assets. While this bid was under consideration of the receiver and the court, Holley went to the defendant, Horne, for assistance in financing the deal should his offer be accepted.

Horne had been a practicing attorney in Wise county since 1908 and his principal business was that of a money broker. The Appalachia Finance Company, Inc., through Holley, its president, and Horne entered into a written contract whereby the latter agreed to assist the corporation in financing the deal in the event the bid was accepted. But the bid was rejected and the written contract relating thereto terminated.

Nevertheless, Holley continued his efforts to purchase the assets and in this he had the continued aid and cooperation of Horne. Together they visited banks in Abingdon and Roanoke and other financial institutions in the effort to raise the necessary money. It is clear, we think, that from the inception of their negotiations until September, 1932, the parties contemplated that the assets should be purchased by Holley or through some corporation set up and designated by him and that Horne merely acted as a broker who was assisting Holley in financing the deal.

Holley contends that in September, 1932, the relation between him and Horne changed, that they then verbally agreed to effect a purchase of the property in their joint

names, and that they continued in this relationship until the assets were finally purchased, as he (Holley) thought for their joint account.

Horne, on the contrary, insists that there was never any agreement between him and Holley to negotiate a joint purchase of the property, that in all of his dealings with Holley he (Horne) was nothing more than a broker, that even this relationship was voluntarily terminated on January 26, 1933, and that Holley was not interested in the purchase of the assets on February 1, 1933, by The Home Land & Investment Company, Inc.

A careful reading of the evidence convinces us that the trial court was right in sustaining Holley's contention as to their joint interest in the property to be purchased.

It is undisputed that on September 26, 1932, Holley and Horne together went to the office of V. B. Tate, an attorney practicing at Wise, Virginia, and employed him to represent them in purchasing the assets. While Horne insists that Holley was the principal and that he (Horne) was merely the broker or special agent of Holley, Tate testified that he was acting for both and that they were to pay him a joint fee for his services. Pursuant to the directions of Horne and Holley he submitted to the receiver a bid signed, "V. B. Tate, Trustee," to purchase the assets for $25,519.62 cash, and in doing so represented both Horne and Holley jointly.

On January 23, 1933, another offer was submitted by "V. B. Tate, Trustee," to purchase the assets. Tate, although called as a witness for Horne, testified that again he was acting for both Horne and Holley, and that he was instructed by them to so advise the judge of the circuit court (whose approval of the bid was necessary) if the latter asked the names of his principals.

The receiver, J. Charles Jones, further corroborated Holley. He testified that in his numerous negotiations with Horne and Holley, beginning in September, 1932, and continuing down to February 1, 1933, when the assets were finally sold, both Horne and Holley repeatedly said that they were endeavoring to purchase the assets jointly. Indeed, the re-

ceiver thought that the sale finally consummated was for the joint account of the two.

O. F. Kilbourne, one of the parties to whom Horne and Holley applied for financial assistance, testified that he understood from his conversations with them that it was their purpose to purchase the property jointly.

If Holley and Horne had agreed to negotiate a joint purchase of the assets, then while such agreement was still in effect Horne had no right to purchase the property solely for his own account. They were joint adventurers in the enterprise and occupied a fiduciary relation to each other with respect to the property which they were seeking to acquire. Such relationship precluded either from acquiring an interest in the assets adverse to the other.

"A joint adventure has been aptly defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.' " 33 C. J., page 841, section 1; *Dexter & Carpenter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647, 651.

The obligations *inter se* of persons engaged in a joint adventure are similar to those existing between partners. The relation is one of mutual trust and confidence. The utmost good faith, the most scrupulous honesty, is exacted of each party toward the other. Each must guard the interest of his coadventurer equally with his own, and must make a frank and full disclosure of all material facts. Each is regarded by a court of equity as a trustee or agent of the other with respect to the enterprise to be undertaken.

"Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and terminated." 33 C. J., pages 851, 852, section 36. See also, 15 R. C. L., page 501, section 3; *Dexter*

& *Carpenter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647, 652; *Maas* v. *Lonstorf* (C. C. A. 6), 194 F. 577; *Meinhard* v. *Salmon,* 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1, and note.

It is well settled that where one person sustains a fiduciary relation to another he can not acquire an interest in the subject matter of the relationship adverse to such other party. If he does so equity will regard him as a constructive trustee and compel him to convey to his associate a proper interest in the property or to account to him for the profits derived therefrom. *Miller* v. *Ferguson,* 107 Va. 249, 255, 57 S. E. 649, 122 Am. St. Rep. 840, 13 Ann. Cas. 138; *Matney* v. *Yates,* 121 Va. 506, 519, 93 S. E. 694; *Carpenter & Dexter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647; *Maas* v. *Lonstorf* (C. C. A. 6), 194 F. 577, 584; 33 C. J., page 855, section 48.

It is equally well settled that an agreement which is the basis of such a constructive trust may be proven by parol testimony and does not violate the statute of frauds. *Miller* v. *Ferguson,* 107 Va. 249, 250, 57 S. E. 649, 122 Am. St. Rep. 840, 13 Ann. Cas. 138; 26 R. C. L., page 1233, section 79; 65 C. J., page 459, section 217.

It follows therefore, that if the relationship of joint adventure between Holley and Horne had not been terminated when Horne acquired the property from the receiver, Holley was entitled, in equity, to his proper share in said assets. This would be true if Horne had purchased the assets in his own name. It is also true where the title to the property was taken in the name of The Home Land & Investment Company, Inc., which, of course, had knowledge, through Horne, its president, of the confidential relation existing between him and Holley.

It should be noted in passing that The Home Land & Investment Company, Inc., was a close corporation. Horne was its president, one of its three directors and its majority stockholder. Two of the remaining shares were owned by Erwin, who occupied a room in the Horne home, and the remaining stock was owned by Mrs. Horne.

But even it it be true, as Horne contends, that there was

no agreement for a joint purchase of the property, that Holley was the principal and he (Horne) was merely the special agent in the transaction, this would not justify Horne's action in buying for his own account the very property which he had been employed to assist in acquiring for his principal.

"It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. * * * This is a rule of common sense and honesty as well as of law." 2 Am. Jur. (Agency), section 252, page 203. *Ferguson* v. *Gooch*, 94 Va. 1, 8, 26 S. E. 397, 40 L. R. A. 234.

And so, where an agent is authorized to purchase property for his principal, and yet purchases the same in his own name and takes a conveyance to himself, he will be deemed, in equity, to hold the title thereto as a constructive trustee for such principal. *Wellford* v. *Chancellor*, 5 Gratt. (46 Va.) 39; *Jackson* v. *Pleasanton*, 95 Va. 654, 657, 29 S. E. 680; *Matney* v. *Yates*, 121 Va. 506, 519, 93 S. E. 694.

The ultimate decision of the case, then, must turn upon whether or not the joint adventure established by Holley's evidence was in fact terminated before Horne consummated his purchase of the property.

Horne contends that when, on January 26, 1933, the receiver rejected the bid filed three days previously thereto by "V. B. Tate, Trustee," (which we have seen was for the joint benefit of both Holley and Horne), Holley, in the presence of Tate, stated that he (Holley) was through with the matter and was no longer interested in bidding on the property. Thereupon Horne employed Tate to represent him. Tate corroborated Horne in this.

Holley testified that after the rejection of the last mentioned bid, he and Horne continued their negotiations; that

on the afternoon of January 31st the receiver informed him and Horne that the court would not approve a bid of less than $18,000 cash; that he and Horne discussed the matter in the presence of the receiver; that he (Holley) was willing to bid this amount but that Horne was uncertain and promised to think the matter over and advise him (Holley) the next morning of his decision. Jones, the receiver, corroborated Holley's testimony as to this interview. Horne denied the conversation *in toto*.

Both Jones and Holley testified that on the night of January 31st they went to Horne's residence and advised him that other parties were considering making a bid on the assets, and that it was important they they (Holley and Horne) decide what they were going to do. Holley again insisted that they should increase their bid to $18,000, but Horne was still undecided and wanted to think the matter over until the next morning.

While Horne admits the visit from Holley and Jones, he denies that there was at that time any discussion of their joint purchase of the assets. He says that Holley and Jones merely asked for a copy of an audit of the bank's assets, and that they left upon being assured that this would be returned to Jones the next day.

Shortly after nine o'clock the next morning Horne delivered to the receiver a check for $18,000 and told him that he was prepared to purchase the property at this figure.

A few minutes later, according to the testimony of both Holley and the receiver, Holley came into the bank. Horne said to Holley, "Congratulate me!" Holley inquired, "Did you get our deal through?" Horne replied, "Yes." Holley then said, "I will have to get out and get busy and get up my part of the money." Horne's reply was, "Go ahead."

According to Holley it was understood between Horne and himself that Horne would lend him (Holley) the sum of $3,000 of the amount necessary to cover the purchase price of his one-half interest in the property. Holley had arranged to borrow the remaining $6,000 elsewhere.

Horne, however, refused to lend this amount to Holley,

whereupon the latter made arrangements to borrow the entire $9,000 elsewhere, so advised Horne, and told him that he was ready to carry out his part of the agreement. Then, for the first time, Holley discovered that Horne had purchased the assets in the name of The Home Land & Investment Company, Inc. Horne refused to convey and deliver any part of the property to Holley and declined to allow him to share in the profits derived therefrom.

There are certain circumstances which, we think, conclusively corroborate Holley's contention that he was still interested in the purchase of the assets up to the time of the consummation of the deal, and that this was known to Horne.

The record shows that on of the afternoon of January 31st, Horne obtained possession of a copy of the latest audit and appraisal of the bank's assets. Horne at first claimed that this was handed to him by Jones, the receiver. He was then confronted by the following note in his own handwriting:

"Dr. Holley:

I took the book: O K with Jones.

H. I. H.

1/31/33. 5:20 P. M. E. S. T.

See you tomorrow."

Horne then admitted that he had gone to Holley's office to get the audit; that upon finding Holley absent he took the audit and left the above note on Holley's desk.

The very fact that Holley was in possession of the audit and appraisal showed that he was still interested in buying the property. Also, if Horne and Holley were not still negotiating, what was the object in saying in the note, "See you tomorrow"? It strongly corroborates Holley's testimony that they were, in fact, still negotiating, that Horne was to consider the matter further during the night and advise him (Holley) of his decision the next morning.

Furthermore it appears from the testimony of both Horne and Tate that they had some qualms of conscience in ex-

cluding Holley from the deal. They discussed the matter and even asked the judge of the circuit court whether it would be proper for them to proceed without Holley. If Holley had told them, as they say in plain and unequivocal language that he was through—that he was no longer interested in buying the property—why the necessity of discussing the matter at all? If, on the other hand, they were uncertain as to Holley's status why did they not discuss it with him instead of the judge?

It is apparent, we think, that they did not want to know Holley's status, and, what is more, they did not want Holley to know their status—that is, that they were negotiating for the purchase of the property for the sole account of Horne.

Horne admits that Holley came to his home on the night of January 31st and asked for the audit containing the latest appraisal of the property. This of itself was notice to Horne that Holley was still interested in the property. And yet Horne according to his own admission, did not disclose to his associate—his partner in the enterprise—that he (Horne) was already prepared to consummate the purchase the very next day.

It follows from what we have said that Horne had no right to purchase for his own account, or for the account of The Home Land & Investment Company, Inc., in which he was the majority stockholder, this property adversely to the interest of Holley.

Appellants argue that there is no proof of a definite, complete and binding agreement between Holley and Horne that they would purchase the property for $18,000, the figure at which it was actually acquired.

But, as we have seen, the evidence does show that the parties agreed to enter into a joint adventure looking toward their purchase of the property. Such confidential relation having been once established required the utmost good faith of each party to the other. This obligation began with the opening of the negotiations for the joint purchase of the property and continued until the confidential relation was dissolved by mutual consent. 33 C. J., page 852, section 36;

*Dexter & Carpenter* v. *Houston* (C. C. A. 4), 20 F. (2d) 647, 652; *Selwyn & Co.* v. *Waller*, 212 N. Y. 507, 511, 106 N. E. 321, L. R. A. 1915B, 160.

It was Horne's violation of this confidential and fiduciary relation to Holley—Horne's acquisition of the trust property adverse to the interest of his associate—which made him a constructive trustee for Holley.

There is no merit in the other assignments of error.

We think the lower court was right in holding and decreeing that the defendants were constructive trustees with respect to the property for the joint benefit of Holley and Horne, and under the duty and obligation to account for the profits derived therefrom.

The decree appealed from will be affirmed.

*Affirmed.*