Theodore **GRANIK**, Plaintiff-Appellant.

v.

John H. **PERRY** Jr., et al.,
Defendants-Appellees.

No. 26569.

United States Court of Appeals
Fifth Circuit.

Nov. 17, 1969.

Rehearing Denied and Rehearing En Banc Denied Dec. 30, 1969.

---

Paul A. Louis, Sinclair, Louis & Huttoe, Bertha Claire Lee, Miami, Fla., for plaintiff-appellant.

Jack F. Wayman, Jacksonville, Fla., Henry F. Richardson, Jr., Coe, Richardson & Broberg, Palm Beach, Fla., Louis Ossinsky, Jr., Ossinsky & Krol, Daytona Beach, Fla., for defendants-appellees.

Before JOHN R. BROWN, Chief Judge, GODBOLD, Circuit Judge, and CABOT, District Judge.

GODBOLD, Circuit Judge.

This controversy comes to us after fifteen years of litigation in two federal circuits, in the state courts of Florida, and before the Federal Communications Commission. We affirm the District Court's dismissal of Count I and reverse the summary judgment granted the defendants on Counts II and III.

Appellee Esch owned a radio station in Daytona Beach, Florida. Telrad, Inc. (a corporation of which Esch was the controlling stockholder) held a construction permit issued by the Federal Communications Commission authorizing construction of a television station in the same city. In the summer of 1954 Esch approached appellee Perry, who had extensive broadcasting and newspaper interests in Florida, about the possibility of Perry's purchasing the radio station and the construction permit.[1] After conferences Perry concluded that for two reasons he was not interested. Esch had in mind selling only 49% interest, and Perry was interested only in sole ownership. The Perry enterprises owned another radio station at Daytona Beach, and acquisition by Perry of an interest in the Esch radio station would have violated the FCC duopoly rule (forbidding ownership in two stations serving the same market).

Soon thereafter Esch began negotiations with appellant Granik and his co-adventurer Cook, and, in October, 1954 the three of them signed a memorandum purporting to entitle Granik and Cook to purchase the radio station, the television construction permit and real estate (owned by Esch and his wife).[2] Cook and Granik attempted to exercise the option. Esch's attorney notified them on behalf of Telrad that the memorandum was void because not approved by the corporate stockholders and directors. In spite of this notice Esch and Granik and Cook continued their negotiations for several months, attempting to reach mutually agreeable terms. Proposed agreements were prepared by counsel to be filed with the FCC, but they were never executed.

---

1. While the radio station, and other property, remained part of the controversy, the real prize being fought over is the television construction permit.

2. The instrument provided that if the option was exercised the transaction was subject to approval by the FCC.

In December, 1954 shortly after receipt of the notice disclaiming the memorandum, Cook entered into negotiation with Perry concerning the possibility of Perry's helping to finance the Daytona Beach television station and also buying into a television station at Palm Beach, Florida, in which Granik and Cook had interests. Cook furnished to Perry market and financial data on the proposed Daytona Beach station and the existent Palm Beach station, coverage maps, cost data for building the Daytona station, a proposal for a corporate structure, and other data. Cook and Perry had various negotiations extending over approximately two months. We do not detail all of the events which occurred, and as to many of them the exact sequence is unclear. Perry returned to Cook the documents that had been sent to him. At some point Perry told Cook he was not interested, which was communicated to Granik. Nevertheless, Perry, and at times his counsel Atterbury (who also was an officer and director of various Perry enterprises),[2A] continued to negotiate with Cook. At some point Cook expressed a desire to "get out of the deal", and Perry then asked Cook's permission to "enter the picture," and Cook gave an equivocal consent. Perry and Cook agree that in whatever "green light" Cook gave to Perry, he was speaking only for himself and not for Granik. Perry was advised by his counsel Atterbury that he should not interfere with the proposed sale from Esch to Granik and Cook. One of the last events in this sequence was a meeting in March, 1955 between Cook and Atterbury at which they were, as Perry described it, "still discussing the possibility of our taking over Channel 2 [the channel allocated in the Daytona construction permit]."

In early April, 1955 Esch notified Cook and Granik that he was terminating the negotiations with them, which had been in progress for about three and a half months, and returned their earnest money. A few days thereafter Esch sold the radio station to third parties, and without delay began seeking other parties potentially interested in coming in on the plans for a television station.

Promptly after learning that the radio station was sold Granik and Cook fired their opening guns. They filed with the FCC a protest to transfer of the radio license, and in the state courts of Florida commenced a suit for specific performance against Esch, Telrad, and the purchaser of the radio station. The FCC, without a hearing, approved assignment of the radio station license. Cook and Granik appealed to the Court of Appeals for the District of Columbia. The Florida circuit court denied motions to dismiss the amended complaint. The defendants in that suit filed a petition for certiorari to the Supreme Court of Florida.

There is no evidence of any dealings between Perry and Esch from the time of their abortive discussions in the summer of 1954 until late 1955. Around December, 1955 when the appeal to the District of Columbia Circuit and the petition for certiorari in the Supreme Court of Florida were pending and the merits of the state case had not been reached, Perry and Esch commenced negotiating over the television permit (each says the other made the initial approach). Perry considered that the sale of the radio station had removed the impediment of the FCC duopoly rule which he had felt himself under in his earlier dealings with Esch. He consulted his attorneys and they gave him approval to go ahead and deal with Esch. Esch's negotiations with other potential purchasers after he broke off dealings with Cook and Granik had been on the basis of a purchaser receiving 49% of stock in a corporation which would own the television station, in consideration for "financing" the station. (At least some of these potential venturers had been driven off by knowledge of the

**2A.** He was an officer and director of WCOA, Inc., discussed *infra*. After WCOA acquired the stock of Telrad he became an officer and director of that company.

pending Florida litigation.) The Perry-Esch dealings, at some of which Atterbury was present, culminated in an agreement on February 16, 1956 for sale (subject to FCC approval) to WCOA, one of the Perry corporations, of substantially all the stock of Telrad, which would give WCOA control of the television permit. While differing in some particulars, the general approach of the agreement was that proposed in the October, 1954 memorandum, a transfer of what amounted to full ownership in consideration of a relatively small cash payment while contemporaneously a separate agreement was made for protracted annual payments to Esch and his wife for their services as consultants and for their agreements not to compete. Meanwhile, on February, 7, the Florida Supreme Court had denied the petition for certiorari.

A petition was filed with the FCC for approval of the Telrad-WCOA sale. Granik called on Perry and insisted he was entitled to participate in the transaction. Granik and Cook protested the transfer before the FCC and sought unsuccessfully to enjoin it in the Florida proceedings. WCOA intervened in the Florida suit, but Perry never became a party thereto.

The FCC approved the Telrad-WCOA sale without hearing. The District of Columbia circuit reversed the appeal before it and remanded.[3] The Florida state court tried the specific performance case on the merits and found that the memorandum was not a valid contract. The FCC en banc held on the basis of the Florida adjudication that Cook and Granik had no standing, which disposed of their protests to both the radio and the television transfers. The Supreme Court of Florida affirmed the trial court,

"without prejudice to any action at law, if any which appellant may have against appellee W. Wright Esch."[4] Later the D. C. Circuit affirmed the FCC decision.[5]

Granik then filed the instant diversity case [6] in the United States District Court for the Middle District of Florida against Esch, Telrad, Perry and WCOA. Count I of the Amended Complaint was construed by then District Judge Simpson as for breach of contract, and motions of all defendants to dismiss were granted. This was not error. No contract with Perry was asserted, and as to all other defendants the Florida judgment operated as an estoppel. Appellant urges that there is no estoppel, on the theory that Count I stated a claim sounding in tort rather than contract. But we need not labor the theories of pleading, because Count I was incorporated by reference in Count II and Count II incorporated in Count III, and Granik will have his day in court on those counts.

Subsequently Judge McRae granted summary judgment for all defendants on Counts II and III. Count II appears to charge tortious interference with a business relationship and breach by Perry of a fiduciary duty to Granik. Count III charges a conspiracy between Esch, Telrad, Perry and WCOA to deprive Granik of a business relationship and a prospective economic advantage. The amended complaint is a verbose and prolix hodgepodge, compounded by incorporation of all of Count I in II and all of Count II in III. It is the antithesis of the short and succinct statement contemplated by the Federal Rules. But, dredging through it, and sifting the record, there appear to be material issues of fact which made summary judgment not proper.

3. Granik v. Federal Communications Commission, 98 U.S.App.D.C. 247, 234 F.2d 682 (1956).

4. Granik v. Esch, 95 So.2d 426 (Fla. 1957).

5. Granik v. Federal Communications Commission, 102 U.S.App.D.C. 258, 252 F.2d 822 (1958).

6. Cook is not a party. The record contains a purported assignment by him to Granik of all his rights. The appellees deny that the assignment was in fact made.

In Florida the concept of fiduciary or confidential relationships is very broad. Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 54 A.L.R. 1173 (1927); Gammage v. Turner, 206 So.2d 252 (Fla.App. 1968); Whittle v. Ellis, 122 So.2d 237, 81 A.L.R.2d 1415 (Fla.App.1960). In *Quinn* the Florida Supreme Court said:

Stripped of all embellishing verbiage, it may be confidently asserted that every instance in which a confidential or fiduciary relation in fact is shown to exist will be interpreted as such. The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. The origin of the confidence is immaterial.

113 So. at 421. This statement has been followed in the later Florida cases. *Quinn* traces its language back to 2 Pomeroy, Equity Jurisprudence (3d ed.) § 956.

■ Florida also recognizes the fiduciary relationships which arise from the more particularized situation of a joint venture.

As to the general duties and obligations of joint adventurers toward each other, they, like co-partners, owe to one another, so long as the relationship continues, the duty of the finest and highest loyalty. "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. * * * Conduct subject to that reproach does not receive from

equity a healing benediction." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1.

The principle is peculiarly applicable in a situation where one person induces another to enter into a transaction for the joint purchase of property on equal terms and for the benefit of both.

Donahue v. Davis, 68 So.2d 163 (Fla. 1953). Justice Cardozo's opinion in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (1928), relied upon in *Donahue*, is the leading authority in the field. *See also*, Horne v. Holley, 167 Va. 234, 188 S.E. 169 (1936); Whitsell v. Porter, 309 Ky. 247, 217 S.W.2d 311 (1949).[7] The joint venturer may not acquire the property for himself to the exclusion of his co-venturer, and if he acquires it he holds it as constructive trustee with a duty to account to his associates. Quinn v. Phipps, *supra*, 113 So. at 423; Meinhard v. Salmon, *supra*; Horne v. Holley, *supra*; Whitsell v. Porter, *supra*; Trice v. Comstock, 121 F. 620, 622 (8th Cir. 1903) quoted with approval in Connelly v. Special Road & Bridge District, 99 Fla. 456, 126 So. 794, 798, 71 A.L.R. 923 (1930); Johnson v. Koyle, 5 Utah 2d 9, 295 P.2d 834 (1956).

■■ Whether a joint venture is created depends upon the intent of the parties, determined in accordance with the ordinary rules governing contracts. It may be express or implied, and little formality of agreement is required. Ditis v. Ahlvin Construction Co., 408 Ill. 416, 97 N.E.2d 244 (1951); Epstein v. Stahl, 176 Cal.App.2d 53, 1 Cal.Rptr. 143 (1959). The agreement need not be of such dignity that it would be subject to specific performance. O'Bryan v. Bickett, 419 S.W.2d 726 (Ky.1967). The fact that joint adventurers may determine to carry out the purpose of the agreement through the medium of a corporation does not change the essential nature of the relationship. Donahue v. Davis, *supra*, 68 So.2d at 171.

---

7. Numerous authorities are collected in Lind v. Webber, 36 Nev. 623, 134 P. 461, (1913), and in 62 A.L.R. 13 and 14 A.L.R.2d 1267, 1293–94.

■ It is not possible on this record to ascertain whether Perry entered into a joint venture under whch he acquired a fiduciary obligation to Granik and Cook, nor whether under the broader sweep of fiduciary relationships in general he was barred from acquiring the television permit to the exclusion of Cook and Granik or from using for his sole benefit information acquired in his fiduciary capacity. The exact sequence of the dealings between Cook and Perry is uncertain. The reasons for and the extent of Atterbury's participation is not shown. The time during the negotiations, and the reason for and circumstances, of Perry's being advised by Atterbury not to interfere with the negotiations between Cook and Granik and Esch, is not clear.

Also it is not possible to ascertain whether if there was a joint venture or other fiduciary arrangement it terminated as to Granik and Cook, or to Cook alone, or as to neither. Whether under Florida law a fiduciary arrangement may be terminated by events other than consensual agreement, and if so the effect thereof on a subsequent acquisition of property, are matters best left to a Florida District Judge.[8] On the matter of consensual agreement, Cook and Perry have differing versions of the "green light" given by Cook to Perry to "enter the picture." In some of his testimony Cook states Perry was free to act in his (Perry's) best interest, but elsewhere Cook characterizes his consent as authorizing Perry to step into the shoes of Esch but subject to the rights to purchase under the October, 1954 memorandum. Also Cook states that in no event was Perry to exclude Cook and Granik from the fruits of the memorandum agreement. We perceive several possible constructions after Cook gave the "green light." Perry could be unconditionally free to deal and the venture over. But, as previously noted, such consent as Cook gave was understood to relate only to him and not to Granik, and we are unable to find in the record that Granik consented to Perry's negotiating with Esch or that Perry ever gave notice to Granik of his intent to do so or, Perry could be free to deal, but if he acquired any of the subject matter he was to hold it subject to the memorandum and to the terms of the venture, so that as a constructive trustee he would be bound to carry out the venture, being in effect no more than a conduit to carry out the joint undertaking. Or, he could be free to deal and would hold any property acquired subject to the memorandum but would be entitled to assert adversely against his former venturers that the memorandum was not an enforceable contract.[9] Engrafted on these possible constructions is the additional problem that after Perry was given the "green light" he and his counsel continued to deal with Cook about securing the Channel 2 permit.

■■ The fact that ultimately the memorandum was adjudged not a valid contract would not of itself terminate the duty, if any, which Perry had. Perry purchased before the Florida case was tried. At that time the undertaking of Cook and Granik might have come to fruition by any one or more of several ways—a state court decree in their favor, settlement with Esch, a different agreement more appealing to Esch—and for any one or more of many reasons, financial, personal, illness, FCC refusal to approve the sale to WCOA, unwillingness of other potential purchasers, change in economic conditions, and, of course, the most obvious contingency of all, that no one knew what the result

8. See discussion of authorities in Johnson v. Koyle, *supra*, 295 P.2d at 834.

9. Whether a joint venturer could, as a matter of law, take such a position without express notice to, or even consent of, his associates is a question for the District Court in the first instance. A joint venturer may not terminate the venture for the purpose of securing the right to purchase the property for his own account. Brown v. Leach, 189 App.Div. 158, 178 N.Y.S. 319, appeal dismissed 228 N.Y. 612, 127 N.E. 909.

would be of a trial in the Florida court. Once Perry bought the prize, the only alternative for the defendants was to fight the litigation to the bitter end to protect themselves, joined by WCOA as intervenor in opposing the claim of Cook and Granik that the memorandum was enforceable. Cook and Granik were deprived of opportunity when it still was an opportunity. It would be no defense to a joint venturer's acquisition of the subject matter of the venture for his own account that after the event it appeared the joint opportunity was not a very good one:

> The trouble about his [the defendant's] conduct is that he excluded his co-adventurer from any chance to compete, from any chance to enjoy the opportunity for benefit that had come to him [the defendant] alone by virtue of his agency. This chance, if nothing more, he was under a duty to concede. The price of its denial is an extension of the trust at the option of and for the benefit of the one whom he excluded.

> No answer it is to say that the chance would have been of little value even if seasonably offered. Such a calculus of probabilities is beyond the science of the chancery.

Meinhard v. Salmon, *supra*, 249 N.Y. at 465, 164 N.E. at 547, 62 A.L.R. at 5.

■ Similarly, the claim for interference with a business opportunity or expectancy is not barred by the fact that the memorandum was found to be not an enforceable contract. The claim is not for inducing a breach of contract by Esch.[10]

Appellant urges that Perry tortiously interfered with judicial process by influencing an FCC commissioner to rule against Granik in the proceedings before that body. This theory was not made the basis of claims in the pleadings and

was first referred to in the District Court in motions filed (and denied) after summary judgment was entered. But this does not preclude the District Court from concluding that such conduct, if it existed, would be evidentiary of the claims which have been pleaded.

Reversed and remanded.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM.

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

10. It is for the District Court to determine whether the opportunity or expectation allegedly interfered with was sufficiently expectable that it can give rise to damages based on tort principles, as opposed to the equitable relief available to one whose fiduciary has possession of the property and on trust principles must account therefor.