William D. WITTER and Charles R. Crofton, Plaintiffs,

v.

Thomas TORBETT, Karl Ketron, Americoal Corporation, Valmar Energy, Inc., Patrick Leuben and Incob Corporation, Defendants.

Civ. A. No. 83–0130–B/A.

United States District Court,
W.D. Virginia,
Abingdon Division.

Dec. 28, 1984.

James Schreiber, New York City, Carl A. Tibbetts, Roanoke, Va., for plaintiffs.

David Bromberg, New York City, James S. McLellan, Kingsport, Tenn., Birg E. Sergent, Pennington Gap, Va., for Torbett, Ketron, Americoal and Valmar.

Hugh P. Cline, Norton, Va., for Leuben and Incob.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

### INTRODUCTION

Plaintiffs, Witter and Crofton, are citizens of the State of New York and the defendants and counter-plaintiffs, Torbett and Ketron, are citizens of the State of Tennessee. Americoal Corporation (Americoal) is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal operating office in Lee County, Virginia. This court has jurisdiction over this matter as there exists diversity of citizenship among the parties and the amount in controversy exceeds $10,000. 28 U.S.C. § 1332. Lueben and Incob have been dismissed as parties to this suit, following the transfer from the Southern District of New York.

### I. Factual Background

Americoal Corporation was incorporated under the laws of Virginia on or about March 18, 1981 by a West German named Lueben. Americoal was to be a shell corporation owned 100% by a second shell corporation, Incob, of which Lueben was the sole shareholder. However, in July of 1981, when the Americoal stock was issued, the 1000 shares issued were divided as follows: Incob 333⅓, Valmar Energy, Inc.,

666⅔. Valmar is a Tennessee corporation which is owned equally by Torbett and his wife (50%), and Ketron and his wife (50%). Neither Incob nor Valmar had a monetary investment in Americoal.

On August 22, 1981, Torbett and Ketron created a limited partnership known as Americoal Corporation and Associates of Virginia, Ltd. (AMVA). The business of the partnership, as stated in the partnership agreement, is to: "buy, sell, lease, operate, manage and mortgage any legal or equitable interest . . . in real property . . . mine, ship, sell and broker coal . . . and to sell, lease or otherwise dispose of, coal and coal lands." (Plaintiffs' Exhibit 3). AMVA was to be divided into 100 ownership units, each of which was to represent the right to 1% of the net profits of AMVA. The partnership agreement also named Americoal Corporation as the general partner, and gave Americoal: ". . . the full, exclusive and complete authority and discretion in the management and control of the business of the limited partnership for the purpose herein stated, and (Americoal) shall make all decisions affecting the business of the limited partnership." (Plaintiffs' Exhibit 3).

In early 1982 Torbett and Ketron decided to attempt to force Lueben to relinquish ownership of his 333⅓ Americoal shares. Lueben did in fact resign as a director of Americoal. The voluntary nature of Lueben's resignation was an issue at trial, although a fascinating and intriguing story, it is of no consequence in this opinion. In an agreement dated March 9, 1982, Lueben, acting on behalf of Incob, agreed to assign his 333⅓ Americoal shares back to Americoal in exchange for 8⅓ AMVA units, which represented 33⅓% of Americoal's holdings in AMVA. The AMVA units (25 initially) were Americoal's only asset. The Lueben-Incob-Americoal agreement noted that, by its terms, Lueben was to receive the equivalent of 8⅓% of AMVA's net profits, or a full one-third of Americoal's projected income. (Plaintiffs' Exhibit 4).

At nearly the same time as Lueben was exchanging his Americoal shares for AMVA units, the initial contacts were occurring between Yale Mining Corporation and Americoal. Yale held valuable leases and mining permits to certain lands which were adjacent to property leased by Americoal. Yale was in financial trouble. Yale's president, Richard Gilliam, approached Torbett in late February, 1982, to discuss a possible merger between Yale and Americoal. This initial meeting was unproductive. However, Gilliam and Ketron, still pursuing merger possibilities, traveled to New York in early July, 1982 and spoke with Crofton, who was the treasurer of Yale.

Subsequent to the meeting in New York, Crofton traveled to Tennessee where he met with Torbett and Ketron. It was this trip which Torbett described as leading "to negotiations and the formation of an alliance, and the takeover of Yale." (Tr. 4–631). Witter, who owned 33⅓% interest in Yale, also became involved in the Yale-Americoal negotiations. Witter was unhappy with Yale's then current management and saw a buy-out or merger as a way to gain a stronger voice in Yale's management decisions. Witter first met Torbett and Ketron on July 14, 1982. It was at this meeting that the four principles (Witter, Crofton, Torbett and Ketron) decided on a course of action which was to merge Yale into Americoal.

The meeting of July 15, 1982 produced a letter, written on Witter's letterhead, addressed to Torbett and signed by Crofton, as attorney-in-fact for Witter, which embodied the basic mechanics for the merger. This letter, known as the "July Option Letter" (Plaintiffs' Exhibit 12), provided that Witter would assign to AMVA his interest in Yale in exchange for 5.24 AMVA units. Furthermore, Witter agreed to become a member of Americoal's Board of Directors and, significantly, to assist Torbett in the acquisition of the remaining shares of the Yale stock. In exchange, Witter required Torbett to ". . . purchase the rights and interests of Incob Corporation if and when it is available, and to make available the opportunity to me to acquire the same. . . ."

(Plaintiffs' Exhibit 12). Obviously, at the time of this agreement, Incob no longer owned any stock in Americoal.

Also included the July letter was Witter's agreement to accompany Torbett and Ketron to London in August to meet with representatives of Labout Investments. Labout Investments handled investments for a wealthy Saudi Arabian family named Kaaki. Although the Kaaki family already owned a significant number of AMVA limited partner units, which represented a large investment, the plan was to seek an additional $2,000,000 to be used in part to fund Americoal/AMVA in a buy-out of the remaining investors in Yale.

By agreement dated July 22, 1982, Torbett and Ketron secured an option from Lueben, on behalf of Incob, to purchase Incob's 8⅓ AMVA units (which had been a part of Americoal's original 25). This option was exercised August 6, 1982, at which time Torbett and Ketron, in their individual capacities, purchased Lueben's/Incob's interests for approximately $98,000. This effectively gave Torbett and Ketron, individually, the right to 33⅓% of Americoal's income from its AMVA holdings.

On August 9, 1982, in New York City, Crofton executed two notes, payable to the bearer, in the principal amount of $97,335 each and delivered the same to Torbett. In exchange, Crofton received a photocopy of an invalid Americoal stock certificate which purported to represent a transfer of 123.33 Americoal shares. Witter, on August 10, 1982, executed two similar notes, both for $97,335, payable to the bearer, which he likewise delivered to Torbett. He received from Torbett an IOU for 123.33 Americoal shares. Torbett signed this IOU as President of Valmar; however, he later, under oath, denied that he was then acting as president of Valmar.

Immediately following the exchange of these notes, the principals traveled to London in an effort to secure the $2,000,000 investment from the Kaaki family. The investment was not forthcoming. The principals' relationship then took a turn for the worse and the merger was never finalized.

Currently Yale and Americoal are in bankruptcy and the notes are unpaid except for a single "no prejudice" payment by Witter.

## II. The Parties' Contentions

Plaintiffs in this suit, Witter and Crofton, seek, *inter alia,* a declaratory judgment that the notes now held by Torbett and Ketron are void. Conversely, the defendants, Torbett and Ketron, assert a counterclaim which alleges that the plaintiffs have defaulted in payment of the notes. The defendants contend that the notes are negotiable, and valid in all respects. The defendants therefore seek judgment for the full amount of the notes with interest and costs. Both parties have also asked for compensatory and punitive damages on several theories.

Among the various grounds alleged by the plaintiffs as reasons that the notes should be held void are: (1) that the purchases of stock by Witter and Crofton were executory in nature and were never finalized because there were conditions precedent to the stock being issued and said conditions precedent have not occurred. Specifically, plaintiffs allege that the stock transaction was contingent upon the complete acquisition by Americoal/AMVA of Yale Mining Corporation, and furthermore, that the merger of Yale with Americoal was itself contingent upon Americoal receiving $2,000,000 from the Kaaki family; (2) that Torbett acted in his capacity as an attorney in his dealings with Witter and Crofton and in the course of said dealings violated the attorney-client relationship by unethical practices, concealment and by taking advantage of his position as an attorney for Witter and Crofton; (3) that Torbett and Ketron committed common law fraud in misleading Witter and Crofton; (4) that Torbett and Ketron were joint venturers with Witter and Crofton and that Torbett and Ketron violated the trust relationship which existed between joint venturers by not revealing all of the matters which were involved; (5) that Torbett and Ketron owed a duty of full disclosure to Witter and Crofton, pursuant to §§ 12(2) of the 1933 Securities Act.

### III. Holding

During the trial of this case, the depiction of the events which resulted in Witter and Crofton bringing suit against Torbett and Ketron might best be described, although euphemistically, as capitalism at its darkest. Although they are not parties to this suit, it appears that the true loss, suffered innocently, was borne by the Kaaki family, the other limited partners of AMVA, and the limited partners of Yale.

The issue presently before this court, although complicated by counsel for both parties, is whether or not the obligations represented by Witter's and Crofton's notes are enforceable. Both counsel have put before the court numerous legal theories by which the court could either enforce the notes or declare them void. Some of these theories are meritorious; others are not. Yet, as with much "complex" litigation which carries the facts far beyond the bounds of true relevancy, this case has at its base a simple question of contractual validity. The parties' agreement, as evidenced by their actions, to exchange notes for stock, constituted a contract. Thus the question before the court is whether or not the contracts which resulted in the exchange of notes for stock were valid.

In a case such as this one, in which jurisdiction is based on diversity of citizenship, a federal court sitting in Virginia must apply the substantive law of Virginia. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Included in the substantive law is Virginia's choice of law rules. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The substantive law of Virginia directs that the validity of a contract is governed by the law of the place where the contract was made. *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426, 177 S.E.2d 610 (1970).

At issue are two distinct transactions. The first was made between Crofton and Torbett, in which Crofton executed and signed two promissory notes, in exchange for 123.33 shares of Americoal stock. The second was between Witter and Torbett, as President of Valmar, in which Witter executed his two notes and exchanged them for Torbett's corporate IOU, which Torbett claims represented a personal obligation of himself. Counsel for both sides made much of the interpretations of these agreements insofar as whether they are to be considered finalized or executory in nature. The court need not pass on this question as its resolution would make no difference in the court's holding.

New York was the forum in which these contracts were entered into and thus *Klaxon* and *Woodson* dictate that New York's substantive law is to be applied to determine the contracts' validity. New York law has long recognized that a party to a contract may have an affirmative duty to disclose facts, which the other party to the contract might consider material, even though such facts are not requested:

> There are, of course, occasions upon which it becomes the legal duty of the individual to volunteer information unasked by another, occasions where a failure to state a fact is equivalent to a fraudulent concealment, and avoids a contract equally with an affirmative falsehood.

*Rothmiller v. Stein*, 143 N.Y. 581, 590–591, 38 N.E. 718, 720 (1894). One such "occasion" where the affirmative duty to disclose arises is when parties to a contract are bound, prior to the creation of the contract, by fiduciary duties. *Id.*

The court is of the opinion that the four principals, Witter, Crofton, Torbett and Ketron, were bound *inter sese* by the duties and obligations of persons who stand in fiduciary positions one to the other. The four principals assumed fiduciary status among themselves due to the fact that they were joint venturers. Whether the law of New York, the forum in which it is alleged the duties of joint venturers were breached by Torbett and Ketron, or the law of Virginia, the forum with the most signif-

icant interest in the joint venture,[1] is applied, a joint venture is established, both *de facto* and *de jure.*

■ The law of New York looks for the following indicia to determine the existence of a joint venture: a pooling of efforts among the parties, a mutual input or control in regards to decisions made on behalf of the venture, a joining of interests, risks and skills, and an understanding to share the losses or profits. *Wagner v. Derecktor,* 306 N.Y. 386, 389, 118 N.E.2d 570, 572 (1954). The Virginia Supreme Court defines a joint venture as follows:

> Although there is no generally accepted definition of joint venture, it is said to exist when two or more persons combine in a joint business enterprise for their mutual benefit, with an express or implied understanding or agreement that they are to share in the profits or losses of the enterprise, and that each is to have a voice in its control or management.

*Wells v. Whitaker,* 207 Va. 616, 625–626, 151 S.E.2d 422 (1966).

The joint venture between the four principals had as its aim the merger of Yale with Americoal/AMVA. It appears to the court that a merger of Yale with Americoal/AMVA was a prudent business strategy, although the facts reveal that the true motivating force was the individual gain to be afforded the four principals. Witter and Crofton were assured that they could pay the notes out of directors' fees to be received from Americoal, and the obligations were described as "slow notes." Torbett and Ketron were secretly making a huge stock profit from their partners.

Crofton testified that Yale was locked by a fifty-fifty split between its directors, with one side led by Gilliam representing the actual management and day-to-day operators, and the other headed by Witter and Crofton representing the investors. Witter stated that Yale had significant potential, yet he felt "frustrated" in his attempts to implement his suggestions as to the direction Yale should take.

The acquisition of Yale interested Torbett and Ketron for a number of reasons. They realized the value of Yale's leaseholds and mining permits and recognized the natural complement Yale provided for the mining and selling capacities of Americoal. Crofton saw Americoal/AMVA's interest in Yale as: "... that while they (AMVA) had one small producing mine, they (AMVA) had shipping capacity far in excess of that. They saw our (Yale's) property as a natural complement to theirs ..." (Tr. 2–26, 27). Furthermore, Torbett and Ketron were most interested in aligning themselves with Witter and Crofton, both of whom are recognized figures in the Wall Street financial community. The inclusion of Witter also meant that Torbett and Ketron could reapproach the Kaaki family for an additional investment in AMVA and use Witter, and his family name and reputation, as a means of lending credibility to AMVA. (Witter is the son of Dean Witter).

The July Option Letter embodies crucial elements of the joint venture. Witter was to trade his interest in Yale for 5.24 AMVA units (which he in turn assigned to Torbett in blank). Crofton, acting as an escrow agent, was to hold and vote Witter's Yale shares pending the closing date of the purchase.

Thus, the object of the joint venture was to merge Yale with Americoal/AMVA so that their respective complimentary features could be united in one productive capacity. The method is also clear in hindsight: Torbett and Ketron had gained sole control of Americoal and the undisputed evidence shows that they operated Americoal without regard to corporate formalities in whatever fashion best suited their ends. With control of Americoal, they were free to invest the money of the limited partnership as they saw fit. Feeling they had the necessary "inside" help in

---

**1.** Virginia has the most significant interest in the joint venture because the object of the joint venture, the merger of Yale with Americoal/AMVA, involved Virginia corporations which held significant property and economic rights in Virginia.

Yale, in the persons of Witter and Crofton, Torbett and Ketron felt the opportunity for a merger was ripe. Likewise, Witter and Crofton saw Torbett and Ketron, with their control of the Kaakis' Americoal/AMVA money, as the perfect source of funds to effect a buy-out of Yale, thus releasing Witter and Crofton from the constraints of Gilliam and other Yale stockholders.

Torbett, in his testimony, described the situation as follows:

> We had formed an alliance with Mr. Crofton and Mr. Witter. We were going to do this transaction, whether or not Kaaki did anything. We were going to fight the battle, and dissolve this deadlock with Yale. They were going to help us find another investor.... We had (formed an alliance), we were in bed together, and we were going to pull this thing out, one way or the other ... So, we were willing to join hands with them and solve their problems. · They were going to help us solve ours, which was undercapitalization.... [O]ur job was to clean up this mess down here in Southwest Virginia, and his (Witter's) job was to open the doors to the investments. It was a joint effort.

(Tr. 4–645, 646).

The joint venture was well underway when the principals met in New York on August 9 and 10, 1982. In fact, the meeting was on the eve of the trip to London, where Torbett and Ketron, with the added presence of Witter and Crofton, hoped to entice the Kaakis to purchase more AMVA units. Crofton was the first to execute his two notes in the principal amount of $97,335 each and exchange them with Torbett for a photocopy of an Americoal stock certificate. The photocopy which Crofton received was invalid as it lacked the corporate seal and the signature of the corporate secretary, as required by Virginia Code § 13.1–20. Witter, upon learning of this "incentive" offered to Crofton, demanded a similar arrangement. Torbett agreed and received two notes from Witter in exchange for the IOU Torbett signed as President of Valmar.

The purported transfer of Americoal stock, which occurred on or about August 9 and 10, 1982, is representative of the manner in which Torbett and Ketron disregarded corporate procedure in their operations of Americoal and Valmar. The 123.33 Americoal shares which Torbett agreed to exchange with Crofton were to come from the 333⅓ Americoal shares which were reacquired by Americoal from Lueben/Incob. Torbett testified that these 333⅓ shares were "retired", and held as treasury stock by Americoal. However, there is no indication that at the time Torbett pledged the 123.33 shares to Crofton, Torbett was acting with any type of corporate approval by Americoal. In fact, Torbett admitted that the Americoal books were not·adjusted to show the stock transfer until September of 1983, at which time minutes were prepared of meetings which never occurred.

Although Torbett admitted that Americoal issued and sold the shares to Crofton, the consideration given for the shares, the two notes, did not become corporate property of Americoal. Instead, the notes were to go to Valmar, which in reality meant to Torbett and Ketron. As Torbett stated: "... [W]e have a company that we control, and we can allocate these assets [the consideration for the stock issue] as we see fit." (Tr. 4–784).

The transaction between Witter and Torbett, in which Witter was to receive 123.33 Americoal shares for his two notes, involved the IOU signed by the President of Valmar. Witter's shares were to come from shares owned by Valmar. Torbett filed an affidavit in the United States District Court for the Southern District of New York, in what was a successful attempt to have this case transferred to this court, in which he swore that the IOU was a personal obligation of his, and that he was not acting as president of Valmar. Torbett's testimony before this court revealed a series of back-dated, fictitious meetings of Valmar, the falsified "minutes" of which purport to show Torbett's removal as an officer of Valmar in July of 1982. Furthermore, minutes of fictitious

Valmar corporate meetings were created in September of 1983, in an effort to leave a paper trail showing a transfer by Valmar to Torbett of 123.33 Americoal shares, which Torbett had pledged to Witter.

Torbett's actions not only represent serious breaches of corporate procedure, both as regards Americoal and Valmar, but they also evidence a level of behavior which is far below that which a joint venturer owes to co-venturers. Torbett's back-dating of corporate transactions, falsification of minutes of fictitious meetings, and the general abuse of the corporate structure, given Torbett's position as an "insider" in both corporations, seriously endangered the value of the consideration, i.e., the Americoal stock, which Witter and Crofton were to receive. Perhaps the most serious breach was his failure to timely execute valid stock certificates to reflect Witter's and Crofton's ownership. Yet this behavior on Torbett's part is overshadowed when the issue of the price per share, which Torbett and Ketron extracted from Witter and Crofton, is examined.

Witter's and Crofton's inducement to enter the contract, which was to ripen into their contractual consideration, was the transfer to both of 123.33 shares of Americoal stock. For the 123.33 Americoal shares, each man signed two notes which were worth in total $194,670. This made the per share price approximately $1,578.

The per share price which Witter and Crofton agreed to becomes significant in light of the August 6, 1982 transaction between Torbett and Ketron and Lueben. In this transaction, Torbett and Ketron, as individuals, purchased Lueben's interest for $98,000.[2] This amounts to a per share price of $294. This differential in the price paid per share ($1,578 versus $294) was never disclosed to Witter or Crofton. It is significant that the figure paid to Lueben was much closer to the true book value of the Americoal stock. As Torbett testified when asked if he told Crofton that Crofton would be paying five times the book value:

> No, sir, I did not. . . . He had access to these financial *pro formas*, and this, and that, and the other; I assume that he knows how to read. I didn't tell him anything.

(Tr. 4–779).[3]

Ketron and Torbett not only failed to tell Witter and Crofton the price paid to Lueben, or the stock's book value, but they also failed to reveal that in their transaction with Lueben they had purchased the right to 33⅓% of Americoal's expected income, inasmuch as the profits of the 25 AMVA units were to comprise Americoal's sole earnings. Thus, whereas Witter and Crofton believed that they were each purchasing the right to a 12.3% distributive share of 25 AMVA units, they were in fact receiving the right to 12.3% of the income from 16.7 AMVA units.[4] Torbett admitted at trial that although the "equities" of the situation required that the reacquired Lueben interest be "merged" with the interest sold to Witter and Torbett, and that this merger would require the appropriate paper transaction (which has never occurred) legally the Lueben interest still remains in Torbett's and Ketron's hands.

---

**2.** Again, the question of Lueben's interest was a much debated question at trial. Lueben had exchanged his 333⅓ shares of Americoal for 33⅓% of Americoal's AMVA holdings, or 8⅓ AMVA limited units. However, for the purposes of valuation, assume that the interest purchased from Lueben by Torbett and Ketron amounted to an interest identical to 333⅓ Americoal shares. Given that assumption, the per share price paid to Lueben four days before Witter and Crofton bought their shares was $294.

**3.** Torbett testified that he told the Kaaki family, at the London meeting, that he was selling the Lueben interest to Witter and Crofton at a profit. Torbett agreed that the motivation for this disclosure was that he felt he and Ketron owed a fiduciary duty to the Kaakis. Torbett also admitted that a partnership existed with Crofton and Witter, yet stated that he refused to tell Witter and Crofton about the price differential, or the profit he and Ketron were making. (Tr. 4–756–757).

**4.** The court believes that the correct interpretation of the July Option Letter is that Torbett was to acquire, for Americoal, Lueben's interest so that Americoal would own 25 AMVA units.

Torbett and Ketron each had an affirmative duty, created by their status as joint venturers, to make disclosures to Witter and Crofton, regardless of whether the latter inquired, on points which were material to the contract. This duty was established early in New York law:

> Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duties of finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of honor the most sensitive, is then the standard of behavior.

*Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (C.J. Cardozo). In Virginia, the duty owed from one joint venturer to another is defined in terms of the "standards of good conduct and square dealing as are required between partners." *Horne v. Holley*, 167 Va. 234, 239, 188 S.E. 169 (1936).

The materiality of the issues not disclosed can hardly be challenged. Both Witter and Crofton testified at trial that had they known of the undisclosed facts, neither would have agreed to the note-stock exchange.[5] Although such testimony is self-serving and can be accorded little weight, Ketron and Torbett offered no contradictory testimony. Furthermore, the court is of the opinion that a four-day difference in a per share price of approximately $1,284, and the difference between an expectation of 12.3% of the proceeds of 16.7 AMVA shares, as opposed to 12.3% of 25 AMVA shares, are both material facts. Both New York law (*See Adams v. Gillig*, 199 N.Y. 314, 92 N.E. 670 (1910)) and Virginia law (*See Rison v. Newberry*, 90 Va. 513, 18 S.E. 916 (1894)) have long held that a concealment, or misrepresentation, of a material fact is grounds for invalidating a contract.

Although it appears that Witter is now a limited partner in AMVA, and assuming *arguendo* that Witter and Crofton were at some time shareholders of Americoal, the court is of the opinion that the matter at hand is governed by the rules of law relating to joint venture, regardless of the presence of the limited partnership and/or the corporation. This court need not address the issue posed by *Weisman v. Awnair Corp. of America*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957), which held that parties may not seek relief based on the joint venture if the individuals in the joint venture have entered into the corporate form, because at issue in this case is the validity of the contract which led to the corporate form, and not an act of the resulting corporation which aggrieved a joint venturer. Furthermore, as the present case is solely among the joint venturers and involves no third parties, this court would follow the reasoning in *Arditi v. Dubitzky*, 354 F.2d 483 (2d Cir.1965), which allows suit based on the duties of a joint venturer, although the parties are linked in a corporate structure, as long as the rights of third parties are not involved.

## IV. Remedy

This court must also look to the choice of law rules of Virginia to determine the appropriate remedy. Virginia law holds that although the substantive law is that of the place of the transaction, "matters of remedy ... are governed by the law of the place where the action is brought." *Willard v. Aetna Casualty and Surety Company*, 213 Va. 481, 193 S.E.2d 776 (1973).

It is well settled in Virginia law that rescission is a favored remedy in cases in which misrepresentation is proven in the inducement of a contract. *Millboro Lumber Co. v. Augusta Wood Products Corp.*, 140 Va. 409, 125 S.E. 306 (1924); *Wilson v.*

---

5. It is clear that the entire joint venture fell apart when Witter learned that he had been misled regarding the acquisition of the "Lueben interest." Torbett sent Lueben, accompanied by Ketron, to New York to lie about the amount he was to be paid for his shares. However, when Lueben told the truth as to what he had received, the whole transaction fell apart.

*Hundley*, 96 Va. 96, 30 S.E. 492 (1898). Rescission of the contracts presently before the court is a particularly appropriate remedy as the defendants have the stock certificates which were to be given as consideration on their part, and the only payment on any of the notes was a "no prejudice" payment by Witter.

Accordingly, the court directs that the slow notes issued by Witter and Crofton be returned to them, the stock certificates for the Americoal stock be retained by Americoal, and the amount of Witter's "no prejudice" payment be returned to him. The parties will bear their own costs. The court declines to award either compensatory or punitive damages.

The Clerk is directed to send certified copies of this Memorandum Opinion to counsel of record.