**WACHOVIA BANK, NATIONAL ASSOCIATION, formerly known as First Union National Bank, a national association, Plaintiff,**

v.

**Dr. Paul TIEN, Ming Tien, Henry Tien, The American University of The Caribbean N.V., et al., Defendants.**

No. 04–20834–CIV.

United States District Court, S.D. Florida.

Aug. 6, 2007.

Alan Grunspan, Esq., Miami, FL, for Wachovia Bank.

Hendrick G. Milne, Esq., and Craig Kalil, Esq. & Carlos Osorio, Esq., Miami, FL, for Dr. Paul Tien, Yife Tien, corporate defendants.

Paul Batista, Esq., New York, NY, Roger Slade, Esq., Andrew Herron, Esq., & Jose Ortiz, Esq., & Kevin Jacobs, Esq., Miami, FL, for Ming Tien and Henry Tien.

Gary Rosen, Esq., Becker & Poliakoff, P.A., Fort Lauderdale, FL, Manjit S. Gill, Esq. & Daniel Wallach, Esq., Becker & Poliakoff, P.A., Coral Gables, FL, for Turks & Caicos Islands, BWI.

Adam Chotiner, Esq., Boca Raton, FL, for Shapiro, Blasi, Wasserman & Gora, P.A.

*INTERIM ORDER REGARDING OWN-*
*ERSHIP OF ACCOUNTS; FIND-*
*INGS OF FACT AND CONCLU-*
*SIONS OF LAW FOLLOWING*
*BENCH TRIAL PURSUANT TO*
*RULE 52(a);*

ALAN S. GOLD, District Judge.

**THIS MATTER** came before the Court following a bench trial which commenced on July 23, 2007. At the trial, the Court heard from the following witnesses: Dr. Paul S. Tien (by deposition), Henry Tien, Ming Tien, Yife Tien, Robert J. Sokol, Jeffrey Craig Froehle, C.P.A., Michael Paul Elkin, C.P.A., and Orin Connor Ward, Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters by this Order the following Findings of Fact and Conclusions of Law:

### I. Procedural Background

This is an action for interpleader pursuant to 28 U.S.C. § 1335 and Federal Rules of Civil Procedure Rule 22, and, alternatively, for declaratory relief pursuant to 28 U.S.C. § 2201 and Federal Rules of Civil Procedure Rule 57 commenced by Wachovia Bank, N.A. ("Wachovia") on April 9, 2004 in order to establish ownership of five bank accounts funds held on deposit in Wachovia. The first bank account is in the name of "American University of the Caribbean School of Medicine" or as referred to throughout this case, "AUC Cayman No. 2." It was account number 9981595648 and is now account 9986157036. The second account was in the name of "American University of the Caribbean" or as referred to throughout the case, "AUC Cayman No. 1." It was account number, 2000015516189 and is now account number 2000016747892. The third account is titled in the name of "Medical Education Information Office, Inc.," or, as referred to throughout the case, "MEIO." This account was account number 9980288176 and is now account number 9986157023, The fourth account is titled in the name

"Southeastern Trust Company, Ltd." ("Southeaster Trust Company" or "SETC"). This account was number 2000015516163 and is now account number 2000016747902 ("The large SETC account."). The fifth account is titled in the name "Southeastern Trust Company, Ltd." This account was number 2000015516176 and is now account number 2000016774915 ("The small SETC account.").

The Cross–Defendants, which consist of members of the Tien family and the corporate entities that they each allegedly control, each have a different position as to who or which entity is entitled to the subject funds. The exception is Yife Tien who has made no claim to any of the funds. Cross-claimant, the American University of the Caribbean ("AUC Cayman No. 1") is a company organized and existing under the laws of the Cayman Islands, British West Indies, with its principal place of business in the Cayman Islands. Cross-claimant, American University of the Caribbean N.V., Inc. ("AUC, N.V.") is a company organized and existed under the laws of the Netherlands Antilles, with its principal place of business on the island of Saint Maarten in the Netherlands Antilles. Cross-claimant, The American University of the Caribbean School of Medicine ("AUC Cayman No. 2") is a company organized and existed under the laws of the Cayman Islands, British West Indies, with its principal place of business in the Cayman Islands. The three foregoing companies are collectively sometimes referred to herein as "the AUC Companies." Cross-claimant, Medical Education Information Office, Inc., ("MEIO") is a company organized and existing under the laws of the State of Florida with its principal place of business in Coral Gables, Florida. The AUC Companies and MEIO claim to own all the funds and contend that Henry and Ming Tien have no claim to the monies in question. On the other hand, Cross–De-

fendants Henry and Ming Tien claim that they are the rightful owners of at least a portion, if not all, of the subject funds.[1]

To summarize, the various entities' accounts which are in dispute among the various entities and individuals is provided below:

1. Southeastern Trust Company LTD:

a. Account # 2000016747902, balance as of January 26, 2004 $61,073,642.23 (old account # 2000015516163);

b. Account # 2000016747915, balance as of January 26, 2004 $2,404,857.78 (old account # 20000155116176);

2. American University of Caribbean:

a. Account # 9986157036, balance as of January 26, 2004 $3,866,555.05 (old account # 9981595648 American University of the Caribbean School of Medicine account overdraft position of -$365.17);

b. Account # 200001674747892, balance as of January 26, 2004 $23,572,694.46 (old account 2000015516189); and

3. Medical Education Information Office:

a. Account # 9980288176, balance as of January 26, 2004 $313,873.71;

b. New account opened by Mr. Yife Tien 9986157023, balance as of January 26, 2004 $790.00.[2]

On March 28, 2006, the AUC Companies and MEIO filed Cross–Claims against Henry and Ming Tien. [DE # 420]. On May 8, 2006, Henry and Ming Tien filed their Amended Answer, Defenses, and Affirmative Defenses to the Cross–Claim. [DE # 440]. In their Defenses and Affirmative Defenses, Henry and Ming Tien stated:

4. Henry Tien is the legal and equitable owner of at least 25% of the funds at issue and the entire AUC enterprise.

5. Ming Tien is the legal and equitable owner of at least 25% of the funds at issue and the entire AUC enterprise.

6. The funds at issue belong to owners of the AUC enterprise, not Cross–Plaintiffs and/or any AUC-related corporate entities.

7. Cross–Plaintiffs' claims are barred by the doctrine of unclean hands.

8. Cross–Plaintiffs do not have the authority to bring forward the Cross-claim and have no rights to, or interests in, the funds at issue.

---

1. While the current parties to this suit are the AUC Companies, MEIO, and Yife Tien on one side and Henry and Ming Tien on the other, this suit has had several parties which have been either been dismissed or have disavowed ownership of the monies in question. First, Dr. Paul S. Tien was originally a party to this suit. In a Motion to Dismiss, Dr. Paul S. Tien argued that he was not an adverse party because he disavowed any personal claim in the accounts held by Wachovia. [DE # 129]. In the Declaration in support of his Motion to Dismiss, Dr. Paul S. Tien stated: "[m]oreover, I do not assert any direct, personal claim to any of the funds at issue at Wachovia. I believe that the funds are all corporate funds owned as described below." In light of these representations, I dismissed Dr. Paul S. Tien as a party on September 30, 2005. [DE # 331]. The Turks and Caicos Government was added as party to this suit in April 9, 2005, one year after the commencement of this litigation. [DE # 220]. The Turks and Caicos Government was an active party to this suit until early 2007 when it filed a Stipulation of Dismissal. Thereafter, the Turks and Caicos Government was dismissed as a party. [DE # 680]. Yife Tien, who is a party, to this suit makes no personal claim to any of the funds in question. [DE # 420]. Wachovia, N.A., which brought this matter, was dismissed after it reached an unopposed Notice compromising claims. [DE # 441].

2. These balances are as of the date of the filing of this action. The balances are currently different which reflect the accrual of interest since the filing of this suit.

9. Regardless of how the AUC enterprise was structured on paper, all members of the Tien family always agreed and understood that each family member owned 25% of the AUC enterprise and its profits.

It is undisputed that Henry and Ming Tien never filed an affirmative Cross–Claim against the AUC Companies, MEIO, and Yife Tien.

On January 24, 2005, the AUC Companies, MEIO, and Yife Tien filed a Motion for Summary Judgment. [DE # 143]. In this Motion, the AUC Companies, MEIO, and Yife Tien argued that there were no genuine issues of material fact in dispute and argued that Henry and Ming Tien have no interest in the monies. In their Supplemental Motion for Summary Judge filed on August 22, 2006, the AUC Companies, MEIO, and Yife Tien argued that the evidence obtained in discovery provides a clear answer as to owns the money in controversy. [DE # 526]. Additionally in their Motion for Summary Judgment, the AUC Companies, MEIO, and Yife Tien argued that even if the Court were to credit Henry and Ming Tien's theory of the case, then Henry and Ming Tien would not be entitled to any more than fifty percent of the assets in controversy. In Response, Henry and Ming Tien argued that the Southeastern Trust Company is an "unincorporated association," composed of the four family members, Paul, Ming, Yife, and Henry Tien, and that the monies held in the name of the Southeastern Trust Company in the Wachovia accounts belongs equally to the four of them. [DE # 552]. To support this proposition, Henry Tien submitted a Declaration. [DE # 549]. Additionally, Henry Tien stated at the video-taped deposition that each of the family members were each entitled to twenty-five percent of all of the assets in question. [DE # 520]. At the oral argument held on October 27, 2006, counsel for Henry and Ming stated that under their theory of the case the four Tien family members, Paul, Ming, Yife, and Henry were each entitled to twenty-five percent of the assets in this case. Because under such a theory, it would appear that Henry and Ming Tien would have no claim to at least fifty percent of the assets in controversy, I permitted Supplemental Briefing on this issue. [DE # 588 & 593] In the Supplemental Briefing, Henry and Ming contended that a significant issue of fact remained regarding their entitlement to all the monies based on other claims. By Order dated December 5, 2006, I denied the AUC Companies, MEIO, and Yife Tien's Preliminary and Supplemental Motion for Summary Judgment. [DE # 601]. In relevant part, the Order denying the AUC Companies, MEIO, and Yife Tien's Motion for Summary Judgment, stated:

I conclude that there are genuine issues of material fact which preclude summary judgment and require resolution at trial. In so ruling, I make no comment on the merit, or lack of merit, of any of the arguments. Accordingly, the AUC Companies, MEIO, and Yife Tien's dispositive Summary Judgment against Henry and Ming Tien [DE # 143], as well as their Supplemental Motion for Summary Judgment, [DE # 526] are both DENIED in their entirety.

[Omnibus Order, p. 12–13].[3] By separate order, I directed that the AUC Companies and MEIO's Cross–Claim against Henry and Ming Tien would proceed with a jury trial. [DE # 600].

---

3. The decision to deny AUC Companies, MEIO, and Yife Tien's Motion for Summary Judgment was also based partly on the fact that this Court could not render credibility determinations with regard to the candor and truthfulness of the parties via a Motion for Summary Judgment.

After the issuance of the Omnibus Order in December 2006, Henry and Ming Tien's local counsel, the firm of Herron, Jacobs, & Ortiz, filed a Motion to Withdraw as local counsel.[4] Upon consent of Henry and Ming Tien, I granted the motion. A new local counsel, Roger Slate and the law firm of Pathman Lewis, commenced representation of Henry and Ming Tien in March 2007. [DE # 646]. Paul A. Batista, Esquire, continued as lead counsel.

In March 2007 after almost three years of litigation, the AUC Companies, MEIO, and Yife Tien filed a "Motion to Direct Henry and Tien to Interpose a Cross–Claim" [DE # 647] to address the fact that Henry and Ming Tien never interposed an affirmative Cross–Claim to the funds at issue here. After a hearing in June 2006, Henry and Ming Tien were permitted to file what otherwise would have been an untimely Cross–Claim. [DE # 695] However, the scope of the Cross–Claim was restricted to the pleadings of record. Thereafter, Henry and Ming Tien attempted to file an overly-broad Cross–Claim which added new damage theories and claims as well as attempted to amend almost all previously submitted pleadings a month before trial. [DE # 703]. I struck this pleading.[5] [DE # 721]. However, Henry and Ming Tien were permitted a final opportunity to file a Cross–Claim. It is undisputed that Henry and Ming Tien never filed a timely affirmative Cross–Claim to the monies in question, despite being given several opportunities to do so.

Instead, in June and July of 2007, a flurry of activity occurred as this matter approached its preset trial date. First, Henry and Ming Tien withdrew their long standing demand for a jury trial and the AUC Companies, MEIO, and Yife Tien did not oppose this withdrawal. [DE# 717 & 718].

Second, after I struck the over-broad Cross–Claim, Henry and Ming Tien's attorneys drafted a series of Motions to Withdraw. Their first motion to withdraw was filed by both their lead counsel, Paul Batista, Esq., and their local counsel, Roger Slate, claiming irreconcilable differences with Henry Tien. [DE # 722 & 723] In an Order dated June 21, 2007, I denied the first round of Motions to Withdraw [DE # 729]. Among other reasons, I concluded that the grounds provided by Attorneys Batista and Slade were merely permissive grounds for their withdrawal at the eleventh hour of this litigation. Before the ink was dry on the Order denying the first round of Motions to Withdraw, both Mr. Batista and Mr. Slade filed a second round of Motions to Withdraw citing allegedly mandatory grounds for their withdrawal. [DE # 738 & 751]. As part of his Motion to Withdraw as Attorney, Mr. Batista withdrew all submissions he filed on behalf of Henry and Ming Tien, including the Answer and Affirmative Defenses to the AUC Companies, MEIO, and Yife Tien's Cross–Claim he filed on their behalf. In his Motion, Attorney Batista explained

---

4. On February 16, 2007, the AUC Companies, MEIO, and Yife Tien filed a "Motion to Dismiss Ming Tien's Claims for Fraud on the Court." [DE # 630]. In the Motion, the AUC Companies, MEIO, and Yife Tien argue that Ming Tien should be sanctioned because she has presented inconsistent positions to this Court and the state court which is presiding over her dissolution of marriage case. At the July 3, 2007, I informed the parties that I would reserve hearing this Motion until after the trial.

5. In response to the filing of an over-broad Cross–Claim, I levied sanctions against Henry and Ming Tien and I directed the AUC Companies, MEIO, and Yife Tien to file a memorandum outlining their costs and attorneys' fees incurred in preparing their Motion to Strike. On June 22, 2007, the AUC Companies, MEIO, and Yife Tien filed a Memorandum outlining their costs and attorneys fees, which totaled $13,808.35.

that he did so to avoid Rule 11 sanctions against himself personally.[6] At oral argument held on July 3, 2007, Mr. Batista again reiterated that he intended to withdraw all pleadings that he filed on behalf of Henry and Ming Tien. Both Henry and Ming, however, expressed their desire to proceed to trial with Mr. Batista and Mr. Slade.

In response to the actions of Attorney Batista, the AUC Companies, MEIO, and Yife Tien presented the Court with a series of Motions for Summary Judgment and/or a Motion for Judgment on the Pleadings in July 2007. The first of these Motions was presented as an *ore tenus* Motion for Summary Judgment at the July 3, 2007 Pre–Trial Conference, which I denied from the bench. Thereafter, the AUC Companies, MEIO, and Yife Tien filed a Renewed Motion for Summary Judgment and/or Motion for Judgment on the Pleadings. [DE # 758].[7] In this Motion, the AUC Companies, MEIO, and Yife Tien argued that Attorney Batista's withdrawal of the pleadings he signed on behalf of Henry and Ming Tien to avoid Rule 11 sanctions left Henry and Ming Tien in default. Among other reasons, I denied the AUC Companies, MEIO, and Yife Tien's Motions because questions of material fact were is dispute on the very face of their own pleadings and Motions which precluded awarding summary judgment. In an Omnibus Order dated July 16, 2007, I denied both of these Motions. [DE # 762]. However, I allowed Attorney Batista to withdraw his certification of the pleadings he filed on behalf of Henry and Ming Tien for the sole purpose of avoiding Rule 11 sanctions.

Partly in response to my July 16, 2007 Order, Henry and Ming Tien's local counsel, Roger Slade and the firm of Pathman Lewis, also withdrew their certifications of pleadings filed on Henry and Ming Tien's behalf in order to avoid the imposition of Rule 11 sanctions. [DE # 763]. Thereafter, the AUC Companies, MEIO, and Yife Tien filed yet another Motion for Summary Judgment, arguing again that Henry and Ming Tien were in default. [DE # 764]. On July 19, 2007, I denied the AUC Companies, MEIO, and Yife Tien's Renewed Motion for Summary Judgment concluding that questions of material fact exist on in the record as to who owned each of the accounts at issue [DE # 765]. Thereafter, this matter proceed to a trial.

## II. Findings of Fact

1. The founder of the American University of the Carribean Medical School was Dr. Paul Tien. Dr. Tien was born in Tiantin, China. He relocated to Taiwan and married Ming Tien. While in Taiwan, he received training in electronic engineering and served in the Air Force. He eventually moved to the United States in 1964 with his wife Ming and their two sons, Henry and Yife. While in the United States, he continued his studies in electrical engineering and eventually obtained two Masters degrees and a Doctorate degree. He eventually taught as a professor, became the Dean of the Department of Electrical Engineering at Belmont Technical College in Ohio and, in 1975, became President of Belmont Technical College. During this time, Ming Tien worked in an electronics company in Cincinnati, Ohio.

6. As an attachment to his Motion to Withdraw as counsel, Attorney Batista filed a copy of unfiled Motion for Rule 11 sanctions that was served on him by the AUC Companies, MEIO, and Yife Tien.

7. AUC Companies, MEIO, and Yife Tien also included a request for leave to file an interlocutory appeal of the denial of their Motion for Summary Judgment. In the Omnibus Order dated July 19, 2007, I also denied this request in the Omnibus Order dated July 19.2007.

2. In 1978, Yife Tien was a medical student in the Dominican Republic. Upon visiting Yife, Paul Tien decided to start an English speaking medical school in the Carribean to primarily teach United States students. At that time, Henry Tien was attending the University of Cincinnati and studying premedical courses. Ming was still working at the electronics factory. After several unsuccessful attempts to discuss the medical school concept with various Carribean Island governments, Dr. Tien reached an agreement with the government of Montserrat to build a new medical school on that island. Notwithstanding that Dr. Tien had little money at the time, he negotiated a long term lease of property and an agreement to construct a medical campus with a minimal investment on his part. In 1978, he formed a not-for-profit company in Montserrat in the name of the American University of the Caribbean at Montserrat ("AUC Montserrat"). While construction was ongoing, Dr. Tien arranged for the medical school classes to begin on August 14, 1978 at Mount St. Joseph's College located in Cincinnati, Ohio, with the understanding that the medical school classes would be relocated to Montserrat by January, 1980. Yife helped recruit the first year class from students attending medical school in the Dominican Republic. At this time, both sons were in their twenties. AUC Montserrat makes no claim to any of the monies in this case and is not a party to these proceedings.

3. In 1980, the medical school began classes in Montserrat. It was profitable from the beginning. Dr. Tien was President. He relocated permanently to Montserrat. None of the other family members worked at the school at that time. They continued to live in Ohio.

4. On December 30, 1982, Dr. Tien incorporated a "for profit" company known as the "American University of the Carib-

bean," a Cayman Islands, British West Indies company, which bought the school from AUC Montserrat. The family referred to this company as "AUC Cayman No. 1". While Ming and Henry dispute the distribution of shares, the clear and convincing evidence support that Dr. Tien arranged for a distribution of 40 shares of the AUC Cayman # 1 to himself and gifted 20 shares to Ming, Henry and Yife respectively. As discussed below, Ming later transferred her shares to Dr. Tien. Yife's shares were redeemed by the company for approximately $1,500,000.00. Reflecting the redemption of Yife's shares, Dr. Tien now owns 75% of the outstanding shares in the company (i.e. 60 shares out of 80 total), and Henry owns the other 25% (i.e. 20 shares out of the total). Neither Henry nor Ming were directors of Cayman No. 1. By their respective tax filings with the IRS, each of member of the Tien family declared, under penalty of perjury, their respective ownership of the shares of AOC Cayman No. 1 consistent with the above findings.

5. In 1983, the Ming, Henry and Yife moved to Miami, Florida.

6. On May 12, 1983, Dr. Tien formed a Florida corporation known as Medical Education Information Office, Inc. ("MEIO") for the purpose of rendering administrative services to the medical school. Its earnings were predicated on a percentage formula associated with revenues of the medical school. Both Henry and Yife worked for MEIO. Yife managed the office and was in charge of recruiting. Henry was in charge of financial affairs. Ming performed limited clerical functions. Originally, 1000 shares were divided equally among the family members. Each family member held 250 shares. As a result of later stock transfers by Paul Tien, the stock in MEIO is now held by Henry (375 shares), Yife (375 shares), and Ming (275

shares). Dr. Tien no longer holds any shares. On September 12, 1994, MEIO opened an account at Wachovia's predecessor, First Union (number 9980288176). This is an account that is subject to the Interpleader.

7. In 1995, there was a volcanic eruption on Montserrat and the medical school was destroyed. Prior to that time, Dr. Tien arranged for the purchase of real property on the island of St. Maarten. He decided to build a new medical school campus on that island. In 1996, he incorporated the American University of the Caribbean School of Medicine, a Cayman Islands, British West Indies company known as "AUC Cayman No. 2" or "AUC-SOM." AUC Cayman No. 2 was the holding company for American University of the Caribbean N.V., a St. Maarten, Netherlands Antilles company incorporated in 1999 (known as "AUC N.V.") which was formed to operate the new medical school and to provide to qualified students the education and training required for a medical degree. All of the shares of stock of AUC N.V. were held by AUC Cayman No. 2. Dr. Tien was (and remains) the sole shareholder of AUC Cayman No. 2. This fact was known by all family members. Dr. Tien served as both President ("Chancellor") and Director of AUC No. 2. Yife Tien was also a director and served as Vice–President and Assistant Secretary. Neither Henry or Ming held an office or any stock with either company. The managing directors of AUC N.V. included a distinguished board including Robert Chertok, Robert Sokol, Francis Marsh, and Jeffrey Hamblin. AUC N.V. is the actual operating company of the medical school. There is an operating agreement between AUC N.V. and AUC Cayman No. 2 whereby AUC N.V. operates the school owned by AUC Cayman No. 2.

8. In June, 1995, AUC Cayman No. 1 made distributions to each of the shareholders. Paul received $3,256,000.00, and Ming, Henry and Yife each received $1,654,000.00. Ming's check was endorsed and deposited into Paul's Tien's account at First Union. The distributions nearly matched the percentage holding of each shareholder.

9. In 1995, Dr. Tien renounced his American citizenship.

10. In 1995, he transferred all of his shares in MEIO in equal distributions to Henry and Yife.

11. On June 1, 1995, Ming transferred her 20 shares of stock in AUC Cayman No. 1 to Dr. Paul Tien in a tax-free gift.

12. On June 12, 1996, Dr. Paul Tien opened First Union account number 9981595648 in the name of "American University of the Caribbean School of Medicine Cayman No. 2." Dr. Tien was the sole signatory on the account. By virtue of a Power of Attorney, however, he gave signatory power over this account to Ming Tien, Henry Tien, and Yife Tien. Thereafter, a certificate of deposit was opened in the name of "American University of the Caribbean." The signatories on the certificate of deposit were Dr. Paul Tien, Henry Tien, and Ming Tien.

13. In October 1996, Henry Tien submitted Form 5471's to the IRS for tax year 1995 in which each Tien family member acknowledged the new allocation of share ownership in AUC Cayman No. 1. On schedule O, Ming acknowledged her gift of 20 shares of AUC Cayman No. 1 stock to Dr. Tien.

14. On February 19, 1999, AUC N.V. was formed as a Netherlands Antilles company, and at some time thereafter took over the operation of the school from AUC Cayman No. 2.

15. The medical school grew into a thriving educational institution on St. Maarten, with three incoming classes per year collectively representing 300 stu-

dents, over 3,500 alumni, and a worldwide faculty of about 1,000 basic science educators and clinical practitioners, employed on a full and part-time basis.

16. Because a large percentage of American students received Government student loans, audit reports had to be provided to the United States Department of Education. Henry, as financial administrator, worked closely with the auditor for the AUC entities from 1996 forwards in compiling the consolidated financial statements. The audits were prepared by Jeffery Froehle of Froehle & Company, Certified Public Accountants. The audits began in 1995. The audits disclosed that the common stock of AUC N.V. was held by AUC Cayman No. 2 which in turn was owned by Dr. Paul Tien as the sole shareholder.

17. The first audit showing a stockholder distribution from net earnings in AUC Cayman No. 2 occurred in 2000 in the amount of $33 million dollars. The audit for the year 2001 showed a stockholder distribution in the amount of $7,982,831.00. The audit for the year 2002 showed a stockholder distribution in the amount of $4,300,000. The audit for the year 2003 showed a stockholder distribution in the amount of $12 million dollars.

18. Mr. Froehle never discussed these distributions with Dr. Paul Tien. He never reviewed, nor did he see, any supporting paperwork of any kind associated with these distributions. He simply was told by Henry, as the financial officer, that the distributions were made to his father at his father's request. Mr. Froehle characterized these arrangements, which lacked supportive documentation, as "very unusual." The audits also reflect that AUC Cayman No. 2 held a number of significant investments in securities during those years.

19. On May 5, 1995, Dr. Tien wrote to Yife and Henry regarding their duties and responsibilities. He stated: "In an effort to improve administrative efficiency of the University and to avoid personal conflict and internal frictions, I am hereby assigning duties and responsibilities to each individual. . . ." He then assigned specific duties of administration to Yife and financial duties to Henry.

20. On October 18, 1999, because of growing tensions between Henry and Yife, Dr. Tien prepared a memorandum giving specific job assignments to his sons. Exhibit 515. Pursuant to the memorandum, he required that: "(2) [T]he information of all bank accounts and investments including account numbers, addresses, assets and contact persons should be kept in my office in St. Maarten." He also stated: "(3) For all companies, American University of the Caribbean School of Medicine LTD, American University of the Caribbean N.V., American University of the Caribbean LTD and MEIO, INC., **I am the only one authorized to sign all banking transfers, withdrawals and transactions. In my absence due to illness or death, any of the following combinations of signatures are required for banking transfers, withdrawals and transactions: (a) Yife Tien and Henry C. Tien, or (b) Yife Tien and Ming C. Tien, or (c) Henry C. Tien and Ming C. Tien.**" (Emphasis added).

21. It is undisputed that the family members absolutely trusted Henry regarding all financial matters until issues arose during the year 2003. It was the custom and practice of the family members, including Dr. Paul Tien and Yife, to sign financial documents "in blank" that were prepared by Henry without reading them or question Henry about them. This included blank authorization or signature cards from financial institutions.[8] Prior to

---

**8.** Yife Tien testified: "That is my signature, but my position is it's quite possible Henry

2003, neither Dr. Tien or Yife carefully reviewed the audited financial reports prepared by Froehle & Company for AUC Cayman No. 2 and AUC N.V. which were provided to the United States Department of Education. When Yife eventually saw the audit reports in 2003, he assumed that "distributions to shareholders" reflected in the reports were made to his father. He did not discuss these matters with his father at the time.

22. On November 23, 1999, Dr. Tien wrote another memorandum concerning the operation of AUC and MEIO:

"Since I founded the American University of the Caribbean (AUC) 21 years ago, the University has gone through very difficult times and has experienced so many unexpected problems and hardships. It was my determination, persistence, and hard working with your three family members' strong support and assistance, all problems and difficulties, which were happened in the past 21 years have been overcome and resolved. Today I feel very proud to see that AUC has become one of the most successful off-shore medical schools in the world. Unfortunately in recent years, Yife and Henry cannot work together as a team due to their very different views on managing certain areas. Therefore, few years ago, I assigned Yife to manage all the functions of the Medical Education Information Office (MEIO) in Miami including clinical duties and I assigned Henry to be in charge of the University's financial matters. Both Yife and Henry report to me directly and must work only on their own assigned duties without interfering other persons jobs of responsibilities. If anyone finds other person's poor performance of jobs or mismanagement of his duties, for the University's interest, you should report the case to me immediately for my information and attention. **Since I am the founder and sole owner of the University, I have the full authority to make decisions on all matters of operating the University.** Therefore, I reserve my right to change or cancel your assignment or duties anytime when I find your job performance being poor and unsatisfactory. You must always follow my directions and guidelines to do you job efficiently and effectively. **During my lifetime, I am the only one authorized to sign all banking transfers, withdrawals and transactions.... After my death, the ownership of the University's assets will be divided as follows: Ming C. Tien 25% ownership shares, Yife Tien 25% ownership shares, Henry C. Tien 25% ownership shares [and] Emerald Field Foundation 25% ownership shares.**" Exhibit 516 (emphasis added)(corrections not made).

23. On June 24, 2000, Dr. Paul Tien wrote a memorandum to Ming, Yife and Henry concerning instructions on "AUC's profits." He stated, in part, "Since 1995, I have abolished offering shares to Ming C. Tien, Yife Tien and Henry C. Tien. I am the sole owner of AUC." Exhibit 100.

24. In the course of the year 2003, the Board of Directors of AUC N.V. increasingly had concerns about Henry's lack of communication concerning financial matters, and his failure to comply with the Board's directives to provide financial information. It, therefore, convened an in-

would give me a blank form and says, here, we need you to sign here. I would sign it without looking at the top, okay, and it could be blank because many time Wachovia Bank officer will give him blank forms to take home. Okay. Wachovia will give him blank forms to take home, special signature cards. He would have everybody sign it, and later he would just fill in the account title, whatever, you know, that needs to be filled in. I believe that's what happened." Transcript, July 24, 2007, pages 140–141.

formal meeting with him on October 24, 2003, followed by a formal Board meeting on October 25, 2003. The unanimous conclusion of the Board was that Henry was exhibiting extremely bizarre behavior and could not be trusted to continue to discharge the responsibilities to manage the Medical School's finances.

25. In late 2003, Dr. Paul Tien first learned that Henry had made transfers of his money and money from the operating accounts of AUC Cayman No. 2 without his permission or approval, and contrary to his explicit direction. As discussed below in more detail, monies were transferred to an entity known as "Southeastern Trust Company, Ltd." Dr. Tien had no knowledge that any funds were placed into that account by Henry at the time of the transfers. Likewise, neither Yife and the Board of Directors knew about the distribution or the placement of funds in the SETC accounts.

26. On December 1, 2003, Dr. Tien requested Henry to provide him with "... the last monthly bank statements for all banking accounts for all of the companies such as AUC School of Medicine, AUC NV, AUC Montserrat (non-profit), AUC Cayman # 1 (operated while we were in Montserrat), and my personal account to which funds were distributed to me (as shareholder for AUSOM) during the past three years." He further stated that "Regarding the Southeastern Trust Company bank account, I want to know which companies are these for? I am waiting for your immediate response." Exhibit 162.

27. On the same day, Henry replied by fax "to Father" in a cover note attaching a series of bank statements separated by captioned dividers. The cover note stated: "I have circled ending balances on the bank statements. The Southeastern Trust Company's funds are your distributions from AUCC–Cayman # 2 since 1995."

28. Henry failed to disclose in the fax the fact that $12 million had been removed from the AUC Cayman No. 2 account and deposited in the AUC Cayman No. 1 account, and had only twelve days earlier been routed to the "large" Southeastern Trust account.

29. On December 15, 2003, Henry was fired by his father, upon recommendation of the Board of Directors, as financial controller. He was removed from continuing any involvement in the finances or management of the medical school. He was directed to turn over the corporate documents and day-to-day control of MEIO and all other medical school affairs to Yife.

*The "Southeastern Trust Company Limited Accounts"*

30. Prior to the year 2000, there were no accounts in the name of "Southeastern Trust Company, Ltd." located at Wachovia or at its predecessors. Nevertheless, in 2000, Henry Tien began to open accounts under the name of the defunct TCI company. In 1985, an entity known as "Southeastern Trust Company Limited" was formed upon advise of Dr. Tien's tax lawyers. The company or trust, as it was, was owned at the time by Dr. Tien. It originally was chartered in the Turks & Caicos Islands. During the 1980's, millions of dollars were placed into Southeastern Trust Company accounts. To Yife Tien's recollection, the money was held on behalf of AUC Cayman No. 1. However, Southeastern Trust Company, Ltd. was stricken off the corporate registered and ceased its corporate existence in 1988. For the years after, "Southeastern Trust Company Ltd." has been merely a fictitious name.

31. On November 26, 2000, Henry Tien appeared at First Union with two "Certified Corporate Resolution for Depository Authorization" [Exhibits 107 and 108]. The Corporate Resolutions represented

that both were adopted at a duly held meeting at which a quorum was present. The Resolutions stated that the meeting was held on November 26, 2000 which was the same date on which Henry signed the Resolution at First Union. Both Resolutions listed Paul Tien as President, Ming Tien as Director, and Henry Tien as Secretary. The signatures of Paul Tien, Ming Tien and Henry Tien were affixed. Both Resolutions stated that only one signature of the three family members was required to deposit and remove funds. Based on the preponderance of the more credible evidence, I conclude that no such meeting was held; that Paul Tien had affixed his signature at Henry's request without any disclosure of purpose by Henry, and that the accounts were established as part of Henry's scheme to remove money from Paul Tien's personal account, and from the AUC Cayman No. 2's operating accounts, in order to deposit such funds in an account accessible by Henry and Ming.

32. It was not until April of 2003 that Wachovia officials brought the existence of the Southeastern Trust accounts to Yife's attention. He had no knowledge concerning these accounts at the time. He reported this information to Dr. Tien who was "shocked" to learn of these accounts, especially given the significant amount of funds involved, and the fact that none of the funds were insured beyond the first one-hundred thousand dollars.

### The Small SETC Account

33. During August of 1995, AUC Cayman No. 1 made stockholder distributions. Four checks were issued to the shareholders. Dr. Paul Tien received $3,256,000, Ming Tien received $1,676,000, Yife Tien received $1,640,000 and Henry Tien received $1,654,000. Ming's check, which was written on June 13th, 1995, was endorsed by her and deposited into a certificate of deposit, opened on July 16, 1996, in Dr. Paul's Tien's name. At trial, Ming

offered no explanation for this transaction. I conclude that it was not intended as a gift but as a vehicle for holding her distribution in Dr. Tien's name on her behalf. At closing argument, counsel for the AUC entities stipulated that it was Ming's money.

34. On July 24, 2000, after a progression of rolling certificates of deposits in Dr. Paul Tien's name, Henry Tien transferred the monies into a certificate of deposit in the name of Southeastern Trust Company Ltd. After another series of rollover certificate of deposits, the monies were eventually transferred to a Wachovia Commercial High Performance Money Market Account (Number 2000015516176) in the name of Southeastern Trust Company Ltd. The address on the account was Ming and Henry's home in South Miami, Florida.

### The Large SETC Accounts

35. The "Large SETC Account" consists of a complicated series of distributions from the retained earnings of AUC Cayman No. 2 from the years 2000 through 2003. As an overview, I conclude that Henry Tien engaged in a scheme to remove retained earnings belonging to AUC Cayman No. 2 during the years 2000 through 2003 under the guise of shareholder distribution without the knowledge or permission of Dr. Paul Tien or the approval of the Board of Directors of AUC N.V. The reasons for this scheme are unclear. What is patently clear is that Henry did not want either his father or brother, Yife, to know about the transfers. Presumably, Henry and Ming intended to remove the money at a later time, perhaps after Dr. Tien's death. In implementing this scheme, I conclude that Henry obtained signatures from his father and brother on forms in the name of Southeastern Trust Company without their full knowledge, understanding and consent as to what they

were signing. They simply signed the forms because they trusted Henry and did not question him about such matters.

36. The first prong of the distribution which found its way into the large SETC Account came from Dr. Paul Tien's own money. The source of the funds was from Dr. Paul Tien's 1995 distribution from AUC Cayman No. 1. The first deposit was on July 16, 1996 in the form of a certificate of deposit at First Union National Bank of Florida in the amount of $1,591,866.73 in the name of Paul Tien. The address on the certificate of deposits was Ming and Henry's home in South Miami, Florida. A series of rollover certificate of deposits followed until the monies ($2,003,306.93) was transferred on July 24, 2000 to another First Union certificate of deposit in the name of Southeastern Trust Company Ltd. It remained in the name of Southern Trust Company LTD in Account Number 013111111146619. On December 30, 2000, the funds were combined with an additional $33 million dollars to create a larger SETC account.

37. The percentage balance of this prong, with attributable interest, on April 8, 2004 was $2,205,162.97 [Exhibit 526]. I conclude by the preponderance of the more credible evidence that the owner of these funds is Dr. Paul Tien, and that the source of the distribution came from the AUC Cayman No. 1 accounts in 1995.

38. The second prong of funds into the large SETC account came from the AUC Cayman No. 2 account at First Union in the name of "American University of Caribbean St. Maarten." As of June 30, 2000, this account had $35,737,378.48 in a certificate of deposit. On July 13, 2000, Henry wrote to a First Union representative to transfer these funds into a certificate of deposit in the name of Southeastern Trust Company Ltd. I conclude that the transfer of these funds coincides with the so-called "stockholder distribution" of $33 million

which was reflected in the year 2000 audited report.

39. The third prong of funds concerns a transfer by check to Paul Tien, on December 31, 2002, in the amount of $4,300,000 from an account at First Union in the name of "American University of the Caribbean St. Maarten, Netherlands, Antilles." This distribution coincides with the so-called "stockholder" distribution that occurred in the year 2000 in that amount. Again, I conclude that this was not a distribution to Paul Tien with his knowledge and consent, but a transfer by Henry Tien of AUC Cayman No. 1 retained earnings without proper authority and authorization. On March 31, 2003, Henry placed the sum into the existing Commercial High Performance Money Market Account in the name of Southeastern Trust Company Ltd.

40. The fourth prong concerns the transfer by Henry, on February 28, 2002, from an existing account at First Union in the name of American University of the Caribbean in the amount of $7,108,964.59 to a certificate of deposit in the name of Southeastern Trust Company, LTD. This transfer coincides with the so-called year 2001 "stockholder" distribution from the retained earnings of AUC Cayman No. 2. After a series of rollover certificate of deposits, this sum, with interest, was transferred to the First Union Commercial High Performance Money Market Account on March 31, 2003. Again, these funds were taken by Henry and deposited without authorization.

41. The last component consists of two checks from the First Union AUC Cayman No. 2 account. On August 1, 2003 and September 8, 2003, Henry Tien wrote two checks on the AUC Cayman # 2 account in the amount of $9 million and $3 million which were deposited into the AUC Cayman No. 1 account as First Union. Henry

then moved the aggregate $12 million (noting that it was to correct deposit errors) from the AUC Cayman No. 1 account, into the large Southeastern Trust account, bringing the balance to $61 million dollars, which rolled forward with interest until later frozen by the Court. This transfer coincides with the so-called "stockholder" distribution reflected in the Year 2003 audit. However, I conclude, based on the preponderance of the credible evidence, that the transfer was not a stockholder distribution, but the unauthorized removal of retained earnings from the AUC Cayman #2 operating accounts by Henry and placed into the Southeastern Trust Company Ltd. account which he established at First Union. When added to the other deposits, the total funds accumulated in the Southeastern Trust Company First Union Commercial High Performance Money Market Account (Number 20000155161163), as of November 28, 2003, was $61,910,111.74.

42. The Court's findings relating to the source and amount of funds discussed above is supported by the well-reasoned expert testimony and report of AUC's expert, Michael P. Elkin, CPA whose conclusions were undisputed at trial. To summarize, except for several million dollars belonging to Dr. Tien personally as of the date of the Interpleader, the remainder of funds in the large SETC account were improperly transferred by Henry Tien from the operating accounts of AUC Cayman No. 2 into a defunct account long abandoned by Dr. Tien.

43. On December 15, 2003, Dr. Tien prepared documents in the name of Southeastern Trust Company indicating that he, "being a Trustee and Founder" of it authorized the removal of the funds from the accounts and prohibited Ming and Henry from undertaking any transactions in the name of the company.

44. On January 7, 2004, Henry Tien and Ming Tien appeared at Wachovia and requested to remove **all funds** from the SETC accounts. Upon being told that Yife Tien had closed the old accounts and opened new accounts on which Henry Tien and Ming Tien were no longer signatories, they stated that they were collectively 50% shareholders of the corporations and that Dr. Paul Tien and Yife Tien did not have the corporate authority to change the accounts.

45. Henry Tien, throughout the case, has been uncooperative with discovery requests. Despite no longer being employed by MEIO, he maintained the financial records of the AUC entities at his house in hundreds of banker boxes. An action in replevin was required to remove these boxes to the offices of his local counsel. Based on events occurring during the trial, I also conclude that Henry Tien has improperly maintained possession of a number of stock certificates that actually belonged to AUC Cayman No. 2. These stock were acquired by AUC Cayman No. 2 as investments. The stock certificates were not returned by Henry to the company after he was fired. In addition, Henry received, but did not turn over, a number of dividend checks that properly belonged to AUC Cayman No. 2. Instead, he transferred to his name, and cashed, stock certificates and dividend checks. He claimed that he used the proceeds to pay for his (and Ming's) attorney fees and certain personal expenses. By order of the Court, I took into custody a number of stock certificates, checks and papers belonging to AUC Cayman No. 2, AUC and MEIO that Henry still maintained at his and Ming's home in South Miami, Florida.

46. An "Order on Temporary Injunction without Notice" was entered in a divorce case filed in Dade County Circuit Court by Ming against Dr. Paul Tien [Ex-

hibit 561]. The AUC entities were included as party defendants. The Dade Circuit Court entered a Temporary Injunction against the removal of the funds subject to this Interpleader, subject to modification on application. The Temporary Injunction Order provides in part:

> The parties are litigants in a federal court proceeding in the United States District Court, Southern District of Florida, Case No. 04–20834–CIV–GOLD/TURNOFFF. The nature of that litigation is an interpleader action (originally filed by Wachovia Bank) concerning funds claimed by the parties. The Corporate Defendants will be referred to as the "AUC/MEIO Enterprise."
>
> The Interpleader Funds are approximately Ninety–Six Million ($96,000,000) Dollars plus interest in United States currency. The federal court proceeding will determine ownership interest and entitlement of each of the parties to the Interpleader Funds. A Receiver has been appointed by the federal court to manage the Interpleader Funds. The Wife claims that all or substantially all of the Interpleader Funds are a marital asset subject to distribution by this Court. The Husband has disavowed any interest in the Interpleader Funds, claiming instead that the funds belong to the AUC/MEIO Enterprise, most of which he claims to own, and all of which he claims to control.
>
> . . .
>
> If the Interpleader Funds are awarded to the Husband and/or the Defendants herein (the AUC/MEIO Enterprise) in the federal litigation … without this Temporary Injunction entered, there is a substantial likelihood that the Husband will immediately cause the funds to be removed from the jurisdiction of the United States, the State of Florida and this Court.

47. The AUC entities agree that, pending further order from this Court, or from the Dade County Circuit Court, the monies belonging to Paul Tien, AUC Cayman No. 1, AUC Cayman No. 2 and MEIO are subject to the state court injunction order, and that no monies should be distributed pending such further order.

48. The AUC entities now concede that the small SETC account is owned by Ming. Henry, Ming and the AUC entities agree that the three accounts at issue (other than the SETC accounts) are held in the respective names of MEIO, AUC Cayman No. 1 and AUC Cayman No. 2. There is no dispute that the monies that funded the MEIO, AUC Cayman No. 1 and AUC Cayman No. 2 accounts came from historical revenues of the respective companies. None of the monies at issue came from corporate distributions of profits to individual shareholders. Ming and Henry continue to insist that the monies in all the accounts (other than the small SETC account) are owned 25% each based on an intra-family agreement that prevailed over thirty years. Although Henry and Ming make this claim, they did not file cross-claims against the AUC entities. Nor have they raised any claims to pierce the corporate veil of any of the companies.

### III. Applicable Law

#### 1. Interpleader Law

I begin with a discussion of the essential aspects of interpleader. The interpleader statute, 28 U.S.C.A. § 1335, permits any person, firm, corporation, association, or society which (1) has in its custody or possession money or property worth $500 or more; or (2) has issued a note, bond, certificate, insurance policy, or other instrument worth $500 or more; or (3) has provided for the delivery, payment, or loan of money or property worth $500 or more; or (4) is under any written or unwritten obligation in the amount of $500 or more,

to bring an action of interpleader if two or more adverse claimant of diverse citizenship are claiming or may claim such money, property, or benefits, and the stakeholder has made the required deposit or bond. Rule 22 provides that persons having claims against a stakeholder may be joined as defendants and required to interplead when their claims are such that the stakeholder is or may be exposed to double or multiple liability. The rule supplements, rather than superseding or limiting, 28 U.S.C.A. § 1335, and provides that interpleader actions are to be conducted in accordance with the Federal Rules of Civil Procedure.

■ Questions of jurisdiction and procedure of a federal court interpleader actions are determined by federal law. *Coastal Air Lines, Inc. v. Dockery,* 180 F.2d 874 (8th Cir.1950). As to matters of substantive law and choice of law questions in actions premised on diversity jurisdiction, the federal court must apply the law of the forum state. *Griffin v. McCoach,* 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941). Thus, the federal interpleader statute is merely a special brand of diversity jurisdiction and the determination of who had the right to an interpleader fund is made under the law of the forum state. *Metropolitan Life Ins. Co. v. O'Ferrall Ochart,* 635 F.Supp. 119 (D.C.Puerto Rico, 1986).

■ It is well-established that interpleader is a form of action originally developed under equity jurisprudence and that a district court has broad and significant powers in an interpleader action. An interpleader action typically involves two stages. In the first stage, the district court decides whether the requirements for a rule or statutory interpleader action

have been met by determining if there is a single fund at issue and whether there are adverse claimants to that fund. 7 *Wright, Miller & Kane, [F]ederal Practice & Procedure: Civil 2d § 1714* (1986). If the district court finds that the interpleader action has been properly brought, the district court will then make a determination of the respective rights of the claimants. *Id.* When there is no genuine issue of material fact the second stage may be adjudicated at summary judgment, and if there is a trial each claimant must prove their right to the fund by a preponderance of the evidence. *Id.*

■ This matter is now in the second stage of an interpleader action. After interpleader is granted and it is directed that an issue be framed between respective party defendants, each defendant occupies the position of a plaintiff and must state his own claim and answer that of the other. *Reconstruction Finance Corp., v. Aquadro,* 7 F.R.D. 406, 409 (D.C.Pa. 1947)("It does not matter which one of the defendants would be designated as the plaintiff in the interpleader since each must establish his own claim.")

The second stage of interpleader involves the determination of the respective rights of the claimants to the stake. At this juncture, each claimant occupies an adversary position to the others and must proceed accordingly. This stage is "ultimately resolved by the entry of a judgment in favor of the claimant who is lawfully entitled to the stake." *NYLife Distributors, Inc. v. Adherence Group, Inc.,* 72 F.3d 371, 375 (3d Cir.1995) (citing *Diamond Shamrock Oil & Gas Corp. v. Commissioner of Revenues,* 422 F.2d 532, 534 (8th Cir.1970)). If there is no genuine issue of material fact, this stage may be resolved by summary judgment;

if the material facts are disputed, each claimant must prove its right to the fund by a preponderance of the evidence. *General Electric Capital Assurance v. Van Norman,* 209 F.Supp.2d 668, 670 (S.D.Tex.2002).

In the second stage of interpleader, the Court determines the rights of the parties and the priority of claims as they existed at the time the interpleader action was commenced. *See In re Enron Corporation,* 2006 WL 1663383, * 4–5 (S.D.Tex. 2006). As the court in *In re Enron,* stated:

> Furthermore, three Circuit Courts of Appeals, including the Second and the Fifth, have held that the district court normally determines the rights of the parties and the priority of claims in an interpleader action as they existed at the time the interpleader was commence. *Avant Petroleum, Inc. v. Banque Paribas,* 853 F.2d 140, 143–44 (2d Cir.1988)(holding "that where an interpleader action is brought to have the court determine which of two parties has priority with respect to the interpleader fund, the court should normally determine priority as of the time the fund was created"); *White v. FDIC,* 19 F.3d 249, 252 (5th Cir.1994)(holding that "activity subsequent to the initiation of an interpleader action is normally immaterial in determining which claimant has a superior right to the interpleader fund"); *Texaco, Inc. v. Ponsoldt,* 118 F.3d 1367, 1369–70 (9th Cir.1997)("The priority of claims to the res in an interpleader action must normally be determined at the time is initiated, and cannot be altered by the events after the interpleader fund becomes viable.") As stated by the Ninth Circuit, "As the entire point of an interpleader action is to resolve then

competing rights and claims, it makes perfect sense that the action itself cannot be used as a vehicle for further jockeying for claim position." *Ponsoldt,* 118 F.3d at 1370.

■ Thus, activity occurring after the initiation of the interpleader action is usually immaterial in determining which claimant has a superior right to the interpleader fund. *White v. FDIC,* 19 F.3d 249 (5th Cir.1994). Where there are two claimants to specific property deposited in court, and one of the claimants moves to dismiss the other claimant's claims, the court may award the property to the first claimant deposit despite the first claimant's failure to answer formally claiming the property. *Syms v. McRitchie,* 187 F.2d 915 (5th Cir.1951).

■ After entering a judgment in the interpleader action the district court also has the power to make all appropriate orders to enforce its judgment pursuant. See 28 U.S.C. § 2361. In an interpleader action the district court may also enter an order restraining the claimants from instituting any proceeding affecting the property until further order of the court. *Rhoades v. Casey,* 196 F.3d 592, 600–601 (5th Cir.1999).

## 2. The Nature of the Property Interest In Bank Accounts and the Lack of Ownership Interests of Signatories to Corporate Bank Accounts

■ A bank account is legally a debt owed by the bank to the depositor. The funds are owed to the depositor by the bank and not to any signatory or other agent of the depositor. *Bank of Palmetto v. Hyman,* 290 F. 353 (5th Cir.1923). In dealing with banks as depositories of corporate funds, it is the common banking

practice to require the corporation to furnish the bank certified resolutions of its board of directors authorizing the opening of the account and naming the corporate agents who are authorized to sign on the account, including the manner of signing, whether singly or jointly with others. See Michie, *Banks and Banking*, Ch. IX, § 181. A bank is protected when relying on such certified corporate resolutions and accompanying signature cards. *See O'Connor v. First Bank & Trust Co.*, 12 N.J.Super. 281, 79 A.2d 687 (1951). However, resolutions and signature cards do not confer any property or other rights to the signatories contained therein since they are for the account holder and the bank's protection and they are only evidence of the corporate agent's authority to operate the bank account. *Glens Falls Indemnity Co. v. Palmetto Bank*, 23 F.Supp. 844 (W.D.S.C.1938). Such authority of a signatory on a corporate account, being the authority of an agent, can always be changed or withdrawn by the corporate principal, acting through its board, whether the signatory is a corporate officer or a mere agent. See RESTATEMENT (SECOND) OF AGENCY, § 118.

■ Applying this law, I conclude that the accounts at issue (other than the small SETC account belonging to Ming) are properly owned by each respective corporate entity and not by the individual shareholders. There has been no claim to pierce the corporate veil in this case as to any of the companies. I further conclude, as a matter of law, that Henry's transfers and distributions into the large SETC account were unauthorized; were undertaken under false pretenses, and that SETC was not a viable entity at the time of the transfers by Henry.

**9.** Under any theory, Henry and Ming never had any conceivable basis to claim more than

### 3. Law of Joint Venture Under Florida Law

■ While not formally filing a Cross-Claim, Henry and Ming Tien's claim to the monies is based partly on a theory of joint venture between the four family members. I address this issue assuming that they can maintain their position based on their affirmative defenses.[9] In *Klaber v. Klaber*, 133 So.2d 98, 100 (Fla.App.1961), joint venture was defined as:

A joint adventure, variably called joint venture, is a contractual relationship in the nature of a limited business partnership. It rests upon an express or implied agreement of two or more persons to combine their property or time or both in a specified course of business, or in a particular business transaction, and to share jointly on some stipulated basis in the profits and losses with each coadventurer having a proprietary interest and coordinate control and authority to bind the others with respect to the subject matter; and the burden of proving a joint adventure rests upon the party asserting its existence. *See Kislak and Hotchkiss et ux. v. Kreedian*, Fla.1957, 95 So.2d 510 (Fla.1957).

In a dissent in *Hallock v. Holiday Isle Resort & Marina, Inc.*, 885 So.2d 459, 464 (Fla.App. 3 D.C.A.2004), Judge Frank A. Shepherd accurately summarized the difference between a joint venture and a partnership as follows:

Florida law certainly recognizes that there is a distinction between a joint venture and a partnership. *Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F.Supp.2d. 1333 (S.D.Fla.1998). It is not that a party to a joint venture would

one-half of the monies at issue (other than in the small SETC account).

not owe a fiduciary duty to the other party. *Deal Farms, Inc. v. Farm & Ranch Supply, Inc.*, 382 So.2d 888, 890 (Fla. 1st DCA 1980) ("relationships of joint venture and partnership are similar and governed by the same rules of law, although distinguishable in certain respects"). Under Florida law, a party to a joint venture owes fiduciary duties to the other party. The critical difference is that with joint ventures, the scope of the business relationship is limited to a single purpose or object. 8 Fla.Jur.2d at § 746 ("Joint venture differs from partnership in that it has a limited and specific object in view, [and] ordinarily terminat[es] when the objects of its creation have been accomplished"). Hence, naturally, the scope of the fiduciary duty is limited to the subject matter of the agreement and does not go beyond the contract. Id. ("some of the incidents of partnership do not, or may not, apply [to joint ventures]").

 Under Florida law, essential elements of joint venture are: (1) community of interest in performance of common purpose, (2) joint control or right of control, (3) joint proprietary interest in subject matter, (4) right to share in profits, and (5) duty to share in any losses that may be sustained. *Advanced Protection Technologies, Inc. v. Square D Co.*, 390 F.Supp.2d 1155 (M.D.Fla.2005). It is well-established under Florida law that joint venture agreements are not required to be in writing. *Id.*

 To prove a joint venture under Florida law, evidence must show all of the following: (1) all the essentials of an ordinary contract, including an intent to enter into a contract; (2) a community of interest in the performance of a common purpose; (3) joint or shared control or right of control over operations, personnel, and facilities; (4) joint ownership interest in the venture's business; (5) a right to share in the profits; and (6) a duty to share in any losses that may be sustained. *Miami-Dade County, Fla. v. U.S.*, 345 F.Supp.2d 1319 (S.D.Fla.2004). The ultimate determination, however, turns upon evidence of intent of the parties. *Florida Trading and Inv. Co., Inc. v. River Const. Services, Inc.*, 537 So.2d 600, 602 (Fla.App. 2 Dist., 1988).

Applying this law, I conclude that the evidence overwhelmingly fails to support any claim of joint venture. Dr. Paul Tien never intended that the members of the Tien family would share equal control or have an equal distribution of profits in AUC Cayman No. 1, AUC Cayman No. 2 or in AUC N.V. On the contrary, the totality of the evidence overwhelmingly establishes that Dr. Tien at all times exercised full management control and majority ownership over AUC Cayman No. 1. Likewise, he maintained full ownership and sole control over AUC Cayman No. 2, and the operation of the medical school. At best, the preponderance of the evidence shows that he gifted stock to family members in AUC Cayman No. 1, but declined to do so in AUC Cayman No. 2 and AUC N.V. The evidence patently fails to support any agreement by Dr. Tien to share profits in AUC Cayman No. 1, except to the extent he decided to do so. Under no circumstances, however, did he agree to share profits in AUC Cayman No. 2. In sum, this case lacks any element that would support an intra-family joint venture.

### 4. AUC's Claim to Accounting and Distribution of Money.

 The AUC Companies, MEIO, and Yife Tien also brought a claim for

accounting under Florida law. A complaint in equity for an accounting must show that the plaintiff is entitled to the relief sought at the time the suit is instituted. Under Florida law, a party seeking an equitable accounting must show the existence of a fiduciary relationship or a complex transaction and must demonstrate that the remedy at law is inadequate. *Kee v. National Reserve Life Insurance Co.,* 918 F.2d 1538, 1540 (11th Cir.1990). The plaintiff must also show that he or she has a right of some kind in the funds involved in the demanded accounting, as, for example, a share in the profits of a partnership. Thus, sufficient grounds for equitable relief are shown by allegations in a complaint for an accounting against agents of the plaintiff wherein it is alleged that, by misrepresentation and falsehood, they misled the plaintiff to the plaintiff's injury and to their own pecuniary advantage. *Granik v. Perry,* 418 F.2d 832, 836 (5th Cir.1969). However, a complaint fails to state a cause of action where no fraud is effectively alleged and where the payments in question are as much within the plaintiff's knowledge as they are within the defendant's knowledge. *Id.*

The AUC entities now concede that no valid claim for accounting exists with respect to the monies in the various accounts. The excellent work of Michael Elkin negates the need for accounting as it relates to the funds at issue. Notwithstanding, I have structured this Order as "Interim" because I am reserving to decide the need for an accounting based on the evidence presented during the trial regarding Henry's activities with regard to AUC Cayman's No. 1 and 2's stock certificates and dividend checks. Henry's attorney, Mr. Batista, concedes the need for an accounting under the circumstances. It is necessary to understand whether it was Henry, AUC Cayman No. 1 or 2 who owned the stock certificates and dividend checks and related accounts at issue. Accordingly, it is necessary to reserve on this issue pending the filing of additional motions by the AUC entities.

Furthermore, prior to this Court's ruling on the actual distribution of AUC Cayman No. 2's monies, and in deference to comity with the Dade County Circuit Court, I direct the AUC entities to seek further relief from the Temporary Injunction issued by the Dade Circuit Court. It is my position that the monies in the large SETC account were improperly removed by Henry from the company's retained earnings and should be returned to the company to be used for medical school purposes. I recognize the concern of the Dade Circuit Court that no distributions should be made in a manner which could be returned to Dr. Paul Tien pending a final resolution of the divorce proceedings. Notwithstanding, any monies returned to the medical school to be used for medical school purposes under the direction of the Board of Directors seems consistent with the intent of the Temporary Injunction. I would suggest such a procedure under the auspices and supervision of the Court's Receiver, Ned Davis. An enhancement in viability of the medical school would only serve to increase the value of the stock from which Ming Tien may be entitled to an equitable distribution under Florida law. It would serve no purpose to allow the AUC Cayman No. 2 monies to remain dormant. The medical school has a stellar board of directors and offers unique worldwide services to medical students. Its viability should not be jeopardized because Henry undertook a scheme to wrongfully remove its retained earnings. So long as Paul Tien does not receive a distribution of the monies, the interests of all parties

should be protected. I also would recommend a request to release the MEIO monies from the Temporary Injunction in that Paul Tien has no ownership interest in that company.

## IV. Conclusion

For the following reasons, it is **ORDERED AND ADJUDGED:**

1. With regard to the ownership of the five Wachovia accounts in question, I render the following findings with regard to ownership as of the date of the interpleader and the current ownership of said accounts.

a. The first bank account is in the name of "American University of the Caribbean School of Medicine" or as referred to throughout this case, "AUC Cayman No. 2." It was account number 9981595648 and is now account 9986157036. This account was and is owned by AUC Cayman No. 2.

b. The second account was in the name of "American University of the Caribbean" or as referred to throughout the case, "AUC Cayman No. 1." It was account number, 2000015516189 and is now account number 2000016747892. This account was and is now owned by AUC Cayman No. 1.

c. The third account is titled in the name of "Medical Education Information Office, Inc.," or, as referred to throughout the case, "MEIO." This account was account number 9980288176 and is now account number 9986157023. This account was and is now owned by MEIO.

d. The fourth account is titled in the name "Southeastern Trust Company, Ltd." ("Southeaster Trust Company" or "SETC"). This account was number 2000015516163 and is now account number 2000016747902 ("The large SETC ac-

count."). I conclude that $2,205,162.97 of the monies (including accumulated *pro rata* interest in the large SETC belongs to Dr. Paul Tien's as his personal monies as of the date of the filing of the Interpleader.) I conclude that the remaining monies were monies misappropriated by Henry from AUC Cayman No. 2. To summarize, except for several million dollars belonging to Dr. Paul Tien personally as of the date of the interpleader, the remainder of funds in the large SETC account were improperly transferred by Henry Tien from the operating accounts of AUC Cayman No. 2.

e. The fifth account is titled in the name "Southeastern Trust Company, Ltd." This account was number 2000015516176 and is now account number 2000016774915 ("The small SETC account."). The AUC Companies, MEIO, and Yife Tien stipulated and I conclude that this account belongs to Ming Tien.

2. I reserve to render judgment on any future Motions filed by AUC Companies, MEIO, and Yife Tien related to accounting issues which arose at trial regarding Henry Tien's retention and use of stock certificates and funds allegedly belonging to either AUC Cayman No. 1 and/or AUC Cayman No 2.

3. No monies shall be released to Ming Tien at this time.

4. I reserve on the issue of AUC Companies, MEIO, and Yife Tien's "Motion for Fraud on the Court" **[DE # 630]** based on her actions and pleadings before this Court and the state court. Within 14 days of the date of this Order, AUC Companies, MEIO, and Yife Tien should inform the Court whether they intend to pursue this Motion in this Court or whether they intend to pursue this Motion before the state court presiding over Ming Tien's dissolution of marriage proceedings.

5. I reserve on the issue of the imposition of sanctions pursuant to Rule 11 against Ming and Henry Tien.

6. The AUC Companies, MEIO, and Yife Tien's "Memorandum Outlining Costs and Attorney's Fees Incurred in Preparing Their Motion to Strike" [DE # 721] is GRANTED. I RESERVE to determine by further order how payment in the amount of $13,808.35 is to be made by Henry and Ming Tien.

7. No monies shall be distributed to the corporate entities, Cayman No. 1, Cayman No. 2, or MEIO at this time. **Distributions shall be made by a further (and final) Order of this Court.** Prior to issuance of an Order distributing the monies of the corporate entities, I direct the AUC entities to serve a copy of this Order on the Dade Circuit Court. I also direct the AUC entities to seek relief from the Temporary Injunction issued by the Dade Circuit Court in accordance with the recommendations of this Order.

8. Within 30 days of the docketing of this Order, the AUC entities shall inform this Court of aby relevant events which occur in the state dissolution of marriage proceeding via status report.

9. As stated in this Order, it is my position that the bulk of the monies in the large SETC account were improperly removed by Henry from the company's retained earnings and should be returned to the company to be used for medical school purposes only. I recognize the concern of the Dade Circuit Court that no distributions should be made in a manner which could be returned to Dr. Paul Tien pending a final resolution of the divorce proceedings. Notwithstanding, any monies returned to the medical school to be used for medical school purposes under the direction of the Board of Directors seems consistent with the intent of the Temporary Injunction. I would suggest such a procedure under the auspices and supervision of the Court's Receiver, Ned Davis.

10. A telephonic status will be held **on September 14, 2007 at 4:30 p.m.** I have set aside 30 minutes. The Court will initiate the call.

11. The parties are directed to inform the Court of any relevant development in this case via joint written, status report.